In the Matter of the Estate of HENRY BREWSTER, Deceased.

Surrogate's Court, Monroe County, December 5, 1932.

*J. A. Parsons*, for the petitioner.

*J. Sawyer Fitch*, for some of the residuary legatees.

FEELY, S. The only question on this accounting is whether certain claims for legal services by one of the trustees should be approved and allowed. No question arises as to allowances for accounting, commissions or disbursements.

The trustees were husband and wife, she being the survivor of the two life beneficiaries, and he being an attorney at law. After the death of his first wife, who was the deceased life beneficiary, and on through the last decade and almost until his death, he devoted practically all of his time to his trusteeship.

In 1924 there was an intermediate judicial settlement, and another by the trustees in 1928. In the latter he was allowed conditionally for such legal services the sum of $3,000 out of principal, and also the further sum of $2,625 likewise. Those services ran from July 1, 1924, to March 31, 1928. His estate now asks also for $6,250, out of principal, for his legal services in the trusteeship from April 1, 1928, to June 12, 1932 (aside from allowance for accounting, etc.). The first two sums, totalling $5,625, were paid out of principal, upon the representation that it was satisfactory to the residuaries; but both decrees expressly provided the matter should thereafter be passed upon when the residuary legatees were properly before the court in that regard. At that time the deceased trustee noted in his records, " the Surrogate expressed some uncer-

tainty as to whether said services as set forth were wholly legal services or whether some part thereof were such duties as a trustee should ordinarily perform;" and also that if any objections were raised, a surcharge could be made against the trustees. The issue is now squarely raised by some of the residuaries, who now object to this court approving the two sums already advanced, and also to its allowing the $6,250 additional.

Both the estate of the deceased trustee, and he himself, took the position that no demand was being made for the service to income in the latter period, 1928–1932. The main question, therefore, is whether the principal of this trust should bear those " legal " services by the lawyer trustee.

The will is silent on the subject. It says nothing as to " net income," nor as to allocation, or apportionment of charges. The general rule, as shown by Surrogate WINGATE in *Matter of Shepard* (136 Misc. 218), is to charge principal only with such expenses as tend to enhance the value of the principal of the trust, while income must bear all ordinary expenses connected with the continuance of the property in substantially its existing state; and this is especially so where the will gives only the " net " income. (See, also, *Matter of Lichtenstein*, Rochester Daily Record of July 11, 1932.)

In other words, Mr. H. W. Jessup summarizes the rule by saying that expenditures to protect the integrity of the corpus, to avert wastage, etc., are charged to principal; but those made to assure productivity, or for ordinary administration costs, are charged to income.

A further condition attaches here, owing to the fact that this deceased trustee was also an attorney at law. Assuming the nature and result of his services meet the requirements for compelling the principal to bear them, still only such of them are allowable as are not administrative and such as any person might perform, but are purely legal in that they call for admission to the bar as a prerequisite to collecting therefor; and " such services and the value thereof should be shown by clear and convincing evidence." (*Matter of Fidelity Trust Co.*, 197 App. Div. 926.) Obviously, services that are administrative do not become " legal " services merely by reason of the fact that the person who performs them happens to be a lawyer. (*Matter of Owen*, 144 Misc. 688.)

The objecting residuaries urge that in the statement of the particulars of those services neither of the conditions has been met; and these objectants ask that the latter claim for $6,250 be denied; and also that the trustees be surcharged with, at least, the major portion of the two advances, totalling $5,625, made to the deceased in 1928, as stated above.

Counsel for the deceased makes three points — that is, if we pass up by mere mention the claim that the objectants hold only a small, contingent interest. The first two seem to be inconclusive; and to have been intended as equitable makeweights. The first of the latter to be discussed is that the widow, who is also sole surviving trustee and beneficiary for life, could for herself ask for more than this bill if she should choose so to do — under the theory of deferred payment where land has lain unimproved and wholly unproductive. There is, however, no foundation in the facts of this case for saying the part of the property that became this trust fund was either " unimproved " or " wholly unproductive," within the meaning of that rule, until 1924, when it was sold. The homestead stood on the west end of the lot, and on the east half was the brick house and barn which the will directed to be sold, with the consent of the widow, and the " proceeds used to construct a substantial dwelling on the west half of said premises fronting on Clinton Street, and to furnish the same in a suitable manner as a residence for my wife so long as she shall remain my widow." The will further says that if the proceeds were insufficient for that purpose the personal property could be used therefor. The widow outlived her husband by some forty years. She and her daughters chose to occupy the homestead as it. was; and rented out the rest. Later on they altered the building on the east end so it yielded enough, at least, to carry itself. At the date of the will, in 1877, there was not any prospect of increase in value in the future, beyond a normal increment; and the outlook then was that the neighborhood of Clinton and Court would retain its residential character for a long time to come. This property, therefore, was neither unimproved, nor unproductive, nor carried by the rest of the estate, which was owned, in a different way, by the same three persons — the widow and the two daughters.

It just so happened that about forty years after testator's death there occurred a boom in some east-side real estate on the fringe of the nearby downtown business section, which flattened out before 1929; and this speculation affected the values in the vicinity of testator's homestead, which stood about an eighth of a mile south of Main street. While this boom was on, the estate was fortunate in selling both the homestead and the structures east of it, at the peak of the prices, for $255,000. This money remained intact since, and constitutes the trust fund, except as hereinafter stated as to the residence purchased by the trustees for themselves out of the corpus. This presents no legal ground for averaging the lean years with part of the one fat year — the year of sale, 1924; or with those that followed 1924; nor is it any reason for paying

now more for legal service because less was paid theretofore. The claim for legal services must be considered without regard to what else the present legatee owner of it possibly might, but actually has not yet seen fit to do. The study devoted to the possibility of applying the rule, on income from sometime unimproved and unproductive property, to the facts of this case was most likely prompted by the desire of the deceased trustee to get out of this large estate the greatest possible benefit for his wife, the life tenant. This theory might involve the matter of apportioning certain charges as between income and principal, that could not be done otherwise. There is no ground for its application either in the facts at the death of testator, nor in the language used in his last will. " To sustain a construction, whereby the capital might be more or less seriously impaired, by using it in the payment of taxes and interest on the mortgage, and in maintaining the realty used by the beneficiary, we ought to find words of the most unmistakable import and pointing unequivocally in that direction." (*Matter of Albertson*, 113 N. Y. 434, 440.) This point was not raised on any of the accountings had herein. It comes in now somewhat collaterally, and argumentatively. The deceased trustee, in his memorandum for the court (Exhibit 7) made in 1928 as to his services, laments the fact that his wife's expectancy was then sixteen years; and says that it is uncertain that either trustee will live to receive commissions and that it is a hardship for them to have to wait so long for compensation for such responsible services, which may be payable only to their estates after death. It seems fair to say that this whole claim shows a deliberate and persistent attempt to charge to principal every possible item of service rendered. This seems to have sprung out of the feeling that the daughters were better entitled to the estate than are the more remote relatives and residuaries; but the difficulty lies in the plan that testator adopted, at a time when it could not be foreseen that the land would yield the great price it did. Even in the narrow range of 1877, testator showed no such liberality as is now sought to be impressed upon the estate. In the years before the boom no claim was ever made that testator had treated his immediate family in a niggardly manner in his last will. These beneficiaries fared far better than he ever expected — especially, the survivor.

The second point is that the residuaries can be deemed to have acquiesced in payments to the deceased trustee that imply an unexpressed contract to pay him thereafter at the rate of $1,500 a year for legal services, aside from accounting. The waivers filed in the 1924 accounting, when the proceeds of sale went to set up this trust, expressly consented that the court might allow the

deceased trustee for "his services and expenses as attorney for the estate such sum or sums as may appear reasonable and just." Surrogate BROWN allowed $7,500, which was paid without objection. In that figure, the boom price is clearly reflected. It amply repaid all that had been done up till the decree of 1924 allowing it. The period covered by that accounting was five and a half years. From this is derived the rate of $1,500 a year; but this is only an approximation, for the claim was not itemized, nor computed on that basis. The deceased trustee himself made no mention of any such agreement or theory in his brief (Exhibit 7) in December, 1928. Having received in 1924 for his legal services the lump sum of $7,500 when the trust was set up, he himself thereafter spread it back, in hindsight perspective, over the five and a half years; and thus booked himself as if he had been paid seriatim $1,363.64 in each year up to 1924. On the whole, this seems to be too narrow a premise to support the broad conclusion now sought to be drawn from it for the benefit of his estate.

In the third place, counsel for the deceased trustee seems to rest his case mainly on the argument that the services set out in the particulars were "for the benefit of the principal." He makes no explicit answer to the point, which was well taken by his adversary, that a person did not need to be a lawyer to perform many of the services embodied in this claim. For those the trustee's commissions were his compensation. Neither his commissions nor his disbursements are now in question, because the residuaries, in open court, waived that point, as well as the allowances made for the accountings.

The largest part of the claim, if not all, falls under the double test that nothing can be allowed unless such as only a lawyer could collect for, and at the same time also such as enhanced the value of the principal. The test might be said to be threefold, inasmuch as, in either of the aspects above mentioned, there must have been some necessity for the rendition of any such service. For instance, there are numerous charges made for procuring an order from the surrogate — e. g., for the trustees to shift one of their deposits from one bank to another — that were granted ex parte, and bound nobody but the applicant and were ineffective, and were not necessary, and served only to give a very formal appearance to a bit of the simplest routine of trustee work.

Most of the items will be seen to have been made "to assure productivity," and were not of a structural or defensive character; but rather were expenses that are ordinarily made to continue the property in substantially its existing state. Obviously, such fall to income to bear.

Only a referee could deal in detail with the voluminous mass of items in this claim for nearly nine years of service, and pick out items of service that could fairly be said to be both strictly " legal " and also necessarily of a constructive or defensive character to the fund itself. Passing up such items as the charge against principal for " examining and destroying rough drafts of petitions, order and memoranda etc., consisting of approximately 2,500 sheets, and the examination and destruction of rough drafts of services &c consisting of approximately 900 pages," let us turn our attention to some matters that have a more substantial aspect than those, or a more legal aspect than the charge for examining the law as to appealing from an order entered on the waiver of all parties in interest. Let us take the day and a half spent in looking up the law on the suspension of the power of alienation. The will " First " gives the widow all testator's real estate so long as she shall remain his widow, with particular directions as to rebuilding the Clinton avenue property which was later sold as aforesaid. The " eleventh " clause gives all the estate, both real and personal, subject to the preceding provisions of the will, " in trust, during the lives of my two said daughters  *  *  *  to the use of my said two daughters, in equal portions, during the life of each; and if either should die without children living at her death, the whole income shall go to the survivor during her life." Here, the first life is that of the widow; the second life that of either daughter as to her respective half; and the third life in series is that of the survivor of them as regards the half of the income that such deceased daughter had been enjoying. This cross-remainder is, probably, a void feature; but one that might be " excised " (*Matter of Durand*, 250 N. Y. 45, 53), without destroying the rest of the testator's plan; with the result that this half of the income would fall to the residuary legatees. This point is not directly in issue here and now, but it throws considerable light on this item of service.

One of these trustees is the survivor of her deceased sister and cotenant. She has elected to follow the literal wording of the will so as to enjoy the whole income, at the same time, however, " reserving," on the several accountings had herein, the right to have a judicial determination as to the validity, construction or effect of any devise or bequest in testator's will. As I recall, none of these " reservations " expressly mentions the suspension of the power of alienation. On the submission of this claim she asked the court to make such a general reservation in its decision, but the request was denied, in order that any ruling made would have its ordinary effect over as broad a range as possible. She was the only one to raise this point. Any legal investigation of the question by her

deceased husband, her sometime cotrustee, was, in all probability, prompted by the clearly anomalous position she was attempting to maintain as to her deceased sister's half of the income, in derogation of the seeming rights of the residuaries thereto, for over a decade. His private legal services in maintaining that ambiguous stand, for that length of time, through two accountings, clearly favored his wife, the life tenant and survivor; and cannot fairly be said to have " enhanced " the principal of the trust, belonging to the residuaries. In fact, there is nothing in the record to show that this matter of suspension, which the trustee was studying " at their expense," was ever expressly brought to their attention.

Next, the matter of the trustees' residence. During the early part of the year 1925 much time was spent by both these trustees in selecting a home for the one of them who was then the surviving life tenant; and by the deceased trustee in regard to the examination of the title thereto, although it was taken under a policy of title insurance; and later on more time was spent as to encroachments and improvements on the residence property. On the representation that the will authorized them so to do, and that the residuaries were satisfied it should be done, these trustees, to buy this property on Pinnacle road, took out of principal the sum of $29,000. This was an outlay of principal that was wholly for the personal use and comfort of these two trustees as their home. It was not an " investment " in the ordinary sense of that word as applied to trustees. The statute permits a loan on land, but not a direct, outright purchase. It is now sought to charge to the principal the legal expenses incidental to that purchase, under the provisions of the " fifteenth " clause of the will, to the effect that these trustees might sell all realty testator owned at death, " and invest the proceeds in other real estate or personal property at their discretion." A similar explanation is given in the 1928 account. Clearly, this language is too general and indefinite to authorize any such departure from ordinary trustee practice. In reviewing the decisions on this point, Mr. H. W. Jessup sums up in these words: " But where the trustee is given ' discretion,' whether ' absolute ' is used or not, the courts as a rule will interpret it as ' trustee discretion ' and limit him to acknowledged trustee investments." (Jessup-Redf. § 1013, p. 2125.) It was not until after the purchase had been made that it was set out in the 1928 accounting, notice of which the residuaries waived in general terms. There is no record of their having specifically approved this " investment." All of the legal expenses incident to the purchase of this home, in the circumstances, should be borne by those who enjoyed it personally, the life beneficiary and her deceased husband, especially in view of its being a misuse

of principal, even if we assume the residuaries have since waived the irregularity of such purchase. As to the latter, the court is not now asked to decide.

The savings of premiums on the bond of the trustees, by their procuring an order of sequestration in lieu of a bond, was a saving for the life beneficiary; for on her the great overweight of authority places this charge. The cases are gathered in *Matter of Lichtenstein* (*supra*), wherein it is pointed out that *Matter of Parsons*, cited by this claimant, is distinctly a minority holding, which is not conclusive here.

The monument, erected in 1925 at a cost of $803 at testator's grave, came about fifty years after his death; and it seems to transcend the fourth clause of the will wherein he directed the erection of headstones and footstones on his lot, implying he then had a monument suitable to him. Apparently, the wishes of the life tenants in the circumstances that arose long after testator's death were favored. Credit for this outlay is allowed in the 1928 accounting; and thus, presumably, was covered by the allowance then made for legal services rendered by the one of the trustees who was a lawyer. At any rate, very little investigation was required into the law on that simple subject; and the petition and *ex parte* order for its payment was largely an unnecessary formality.

Now, as to the return on the capital gain taxes and the payment thereof, in installments, and by the formality of various orders of court aforesaid, while there is ground to say this concerned the principal, yet the services rendered were not exclusively " legal " services. Such returns are commonly made out by lay accountants, trust officers and other bank and corporation officials; and it actually appears in this claim that the deceased trustee on February 16, 1925, had a " conference with the capital gain expert at the Genesee Valley Trust Company;" and the items of claim show he did the same thing on February ninth, April fourth and November twentieth; and that on February eleventh he also had a conference with the Deputy Collector of Internal Revenue in this regard. Undoubtedly, he learned a great deal from these practical. " expert " men, who are not lawyers. The gross tax paid, on three occasions, did not exceed $1,800 in any one case. The claim shows services rendered on five different dates.

Other legal service is particularized as examining the law and decisions as to usury in the purchase of mortgages. Residuaries are not concerned whether the principal be put out at use, in any form, or left on deposit, even without interest. The life tenant, however, " to assure productivity " must, at his own risk, resort to investment, and do so in a legal manner. While usury might

ultimately bring loss to the residuary, yet the cost of avoiding it is first of all something incidental to the obtaining a yield, or a greater yield, on the principal fund, which is the peculiar task of the life tenant to obtain; and so, in the first instance, the life tenant must bear the cost of complying with the statutes in respect to the legality of her outlay of the principal in undertaking to get the use on it. The same holds true as to ascertaining from trust officers and State departments whether certain securities were on the trustee list, whether a given bank was sound, whether any priority attached to the deposit, and in examining uninsured titles where the mortgagor did not pay, as usual, the expenses of the loan.

With regard to the credit claimed for procuring the land contract to be drawn so as to take back an installment mortgage for the purchase price of the Clinton avenue corner, which resulted in certain tax advantage, it seems that such service must have been rewarded by the $7,500 allowance made when the proceeds of that sale were set up in the form of the present trust.

The items of claim also comprise some that are too general to be made the basis of any allowance — for example, " examining laws and decisions as to the rights and duties of executors and trustees," frequently, as the *Daily Record* happened to report them; or " examining the will with relation to legacies and construction of certain clauses," etc. The rest of the items are, obviously, not " legal " services, or they are such as were necessitated to " assure productivity;" and need no further discussion.

Although the evidence falls below the standard of being " clear and convincing " (*supra*), in many respects, still there may be something in regard to the capital gain taxes, and the monument, that could be recompensed as a principal charge. Those taxes, as set out in the claim, relate to two years, and to State and Federal governments. In the circumstances, an allowance of $500 out of principal would seem fair recompense for all the strictly legal work this trustee necessarily did to enhance or to defend the principal within the rules above mentioned. As the deceased was at once both lawyer and trustee, this allowance, however, should not be paid, nor credited, until the advances out of principal hereinafter mentioned have first been restored to the principal fund, with interest, under the familiar rule as to a claim for offset in favor of the fiduciary personally against the trust fund in his hands.

On the confident assurance of the claimant that he could procure the approval of the residuaries, he and his cotrustee withdrew, with the conditional permission of this court as aforesaid, two sums out of principal, amounting to $5,625, and paid them over to the deceased trustee personally on account of this claim for legal services.

The condition has not been met, and the withdrawal and payment aforesaid cannot be approved, for the reasons above stated.

The surviving trustee and the estate of the deceased trustee will be held, upon their accounting, jointly and severally bound to restore said sums of principal to the principal fund, with six per cent interest thereon from the respective dates of the several withdrawals. It is enough for this decision to mention only the liability as bearing on this claim for legal service by the trustee.

Enter a decree in accord with this decision, without costs, to the applicant.