In the Matter of the Estate of MARIA H. CRONISE, Deceased.
Surrogate's Court, Monroe County, July 1, 1937.

*W. H. Plumb* [*A. E. Sutherland, Jr.,* of counsel], executor in person.

*J. Sawyer Fitch,* for the legatees.

FEELY, S. In this final judicial settlement of the account of the executor, several matters are to be determined, mainly, the apportionment of the estate or death taxes laid both by the Federal government and by the State of New York; and next the allocation of certain disbursements of the executor as between the life beneficiary and the residuary legatees.

Testatrix was domiciled in Rochester, N. Y., where she made her last will on April 2, 1933, and died on the eighteenth of the next August. After the will had been probated in this court, it was re-probated in Stockton, Cal., where testatrix also had both real and personal property. Her last will was that her debts and funeral expenses be paid; and also $5,000 be given to Mills College for a scholarship. By the third paragraph she gave to her sister, Mrs. Eliza F. H. Middlecoff, now by marriage, Mrs. Emery, of Stockton, Cal., " all real estate owned by me situate in the State of California; " and by the next paragraph to the same sister there was given " as her absolute property all my personal effects such as jewelry, clothing, household furniture and all other articles of domestic and personal use." These personal effects lay in Rochester, N. Y. The general residue of her estate was given to Security Trust Company, in trust,

" (a) to collect and receive the rent, issues, income and profits thereof, and after paying therefrom all lawful dues and expenses in respect thereof, the pay the net income thereof to my said sister, Eliza F. H. Middlecoff, in monthly payments as long as she shall live; and

" (b) on the death of my said sister, the corpus, with any unpaid net income to " two named nephews, who are the children of the life beneficiary, and are residents of the State of California.

1. There is nothing else in the will that bears on the matter of allocation or apportionment.

" The general rule, as shown by Surrogate WINGATE in *Matter of Shepard* (136 Misc. 218) is to charge principal only with such expenses as tend to enhance the value of the principal of the trust, while income must bear all ordinary expenses connected with the continuance of the property in substantially its existing state; and this is especially so where the will gives only the ' net ' income. (See, also, *Matter of Lichtenstein,* Rochester Daily Record of July 11, 1932.)

" In other words, Mr. H. W. Jessup summarizes the rule by say-ing that expenditures to protect the integrity of the corpus, to avert wastage, etc., are charged to principal; but those made to assure productivity, or for ordinary administration costs are charged to income."

In *Matter of Brewster* (148 Misc. 390, 392), from which the fore-going summary of the rules is copied, the same distinction is also expressed by referring to one class as items made to assure pro-ductivity, but to the other class as items of a structural or defensive character.

The facts bearing on the allocation of outlays, other than for death or estate taxes, are undisputed. The homestead is a large, spacious house, on a large city lot, in a somewhat central section of this city and in a neighborhood that has changed from a fine residential section to one of a boarding house and professional office class; and at death of testatrix was not the kind of a house that could be let to an ordinary family. This real property is valued at $15,000. Despite the executor's efforts, the house was neither sold nor leased, except that the life tenant was in occupancy of it from November 1, 1933, till December twentieth following; and thereafter it stood idle until October, 1935, when it was let at a rental that hardly meets the carrying charges. The expense of fitting up the property for this tenant is one of the items in question.

In the meantime, the executor paid a caretaker to watch the prop-erty and keep the yard and walks in condition; and in the house there were living for a time, for the purpose of caring for the house and its contents, a maid and a sister-in-law of the testatrix, for whom food, etc., was supplied by the executor until the arrival here of the life beneficiary. These outlays kept the property in good condition, and protected it from the dangers to which vacant houses are nowadays exposed, especially when filled, as this house was, with furniture, etc., of the appraised value of $5,612 (New York tax deposition), which had been specifically bequeathed to the life beneficiary as the latter's absolute property. This movable property the executor could as well have put into a public storage warehouse at the charge of the specific legatee. On the basis of the value of the lot and house alone at about $15,000, and this specific legacy at $5,612, one-fourth of these caretaking charges, with insurance premiums on personalty, should be borne by the specific legatee, and the remaining three-fourths should be appor-tioned between the life beneficiary and the residuary legatees in such ratio as the value of the life estate bears to that of the residuary, because to that extent a common benefit was derived therefrom by both parties in interest. A like apportionment should be made

of the expense of caretaking (other than fire insurance) from the time the life beneficiary moved out, taking the personal property with her, until the present tenant was found in October, 1935. The city and county taxes that became liens before the death of testatrix for ordinary purposes other than for local improvements, must be borne wholly by the residuary legatees, but those that became liens after the death of testatrix fall entirely to the charge of the life beneficiary under the provision of the will giving her only " net " income.

On September 14, 1933, a plumbing bill of six dollars was incurred, which was paid December 13, 1933. This appears to have been an ordinary repair. The fact that it was the culmination of wear that probably was given it mainly in the lifetime of the testatrix does not lessen the obligation of the life beneficiary, now that the latter has accepted benefits under the will, from bearing the whole of this charge, as she is deemed to have accepted the condition of the property as it was on the date of the death of the testatrix. No authority for apportionment of any such repair charge has come to the attention of this court.

Most of the other outlay in question arose out of the fitting up of the large outmoded family residence so that it could be used as a boarding house. In this adaptation, the making of a new bathroom was required in addition to the existing two; and $22 was laid out on a partition, $10 on resetting a door, and $100.63 for decoration af'er these changes. The plumber's bill for the fixtures installed in this new bathroom, with ventilation, amounts to $233. As the only call in this neighborhood is for a lay-out suitable either for boarding house purposes or for the offices of medical or dental doctors, this adaptation was necessary rather than optional, and was designed to " assure productivity," and at the same time it consisted of a permanent addition to the structure of the house; and the cost should be apportioned.

The same is true of the bill of thirty-five dollars spent to run a new pipe line from the heater to the old front bathroom on the second floor, which never before had been heated, except by the seepage from adjoining rooms. Likewise, the seven dollars and five cents spent for new door bells; and the forty-eight dollars and sixty-six cents spent for new wire screens for windows that never had been so equipped before; and the thirty dollars spent for firebelt and rope to comply with the ordinance in respect of the apartment on the third floor. All of these should be apportioned between the life beneficiary and the residuary legatees in such ratio as the value of the life estate bears to that of the residuary interests. (*Matter of Laytin*, 2 Con. Surr. 106. See, also, *Peerless Candy Co.*

v. *Kessler*, 123 Misc. 735; *Matter of Whitney*, 75 id. 610; *Peck* v. *Sherwood*, 56 N. Y. 615.)

Then there is a group of replacement of outworn items, like the ninety-one dollars spent to replace a worn-out water heater with a new one. The residuaries were not required either to repair or to replace it (*Stevens* v. *Melcher*, 80 Hun, 514, 524); but the life beneficiary would find her income impaired without one, in the peculiar circumstances of this case. Similarly, the removal of the old coal range, and the replacing of it with a used one, at a cost of fourteen dollars and sixty-three cents; and also the replacement of an old ice box with a used electric refrigerator at a cost of $139.50; and likewise in the heating system, an old oil burner, that had been fitted to the furnace had worn to uselessness, and was replaced with a used burner, and the furnace reset, at a cost of $150; these replacements were substantial, and were all put in to stay as long as they should last; although the manner in which some were connected or fastened was not in itself enough to indicate the permanency of the intention with which they were installed. All these replacements, in the circumstances, should be apportioned between the life beneficiary and the residuaries, as aforesaid.

Then there is a group of ordinary repairs, such as the leak in the water pipe, repaired at a cost of fifteen dollars; the repairs to the trap under the tile floor in the old bathroom, at a cost of fifty-nine dollars and seven cents; also the two dollars and forty-seven cents paid to relieve stoppage in the laundry trays; the synchronizing of the thermostat, and repair of leaks, at a cost of six dollars and twenty-four cents; the twenty-five dollars paid for painting the living room; and the twenty-three dollars and thirty cents paid for repairs to the oil burner; and the replacement of the fallen ceiling with plasterboard at a cost of seventeen dollars and twenty-five cents, probably necessitated by the leaks mentioned above — all these fall entirely to the charge of the life beneficiary. To this class should be added the ten dollars paid to clear the garage of the two useless and worthless old safes.

2. The executor's expense in probating this will in California inured to the benefit of the legatee to whom testatrix had devised specifically " all real estate owned by me situate in the State of California; " and it also benefited the residuary trust inasmuch as there was considerable personal property, also situate in that State, which will go into this trust. May that expense be allocated or apportioned for that reason? An executor, by accepting the nomination as such, becomes obliged to execute the last will; and to that end a decree of probate is practically indispensable. The will is thus formally established in several respects — as one

integral act, and also conclusively as to all parties in interest, and as to all the property of the testatrix wheresoever situate — at least, such is the policy of New York as to regularly foreign-made wills that are in writing and subscribed by testator. Re-probate is usually not required in New York, although it is practiced in some other jurisdictions. The integral character of the act of probate — whatever be its procedural incidents in other juris-dictions — whether by record there of an exemplified copy, or by a decree re-probating the original instrument — appears to have caused it to be ever regarded here as a fundamental administrative expense, properly chargeable to corpus on account of its general structural nature. While the executor was not obliged, in an amply solvent estate like this, to take possession of the sometime property of the testatrix situate in other jurisdictions that had been specifically devised or bequeathed by her, nor to make actual physical delivery thereof to its specific legatee (*Matter of Columbia Trust Co.*, 186 App. Div. 377), still the executor was obliged to execute the last will whereby the property had been given, and also to establish title thereto in the ordinary manner as an inseparable part of the integral will he undertook to execute. To ask the legatee of speci-fied property, other than the residue, to pay the expense of formally establishing the wish that the legatee should have it before others were served — as is usually the intention of testators — is not in line with that intention, nor justified by any authority known to this court. This applies not only to the specified land but also to the rest of the California property, to wit, the personalty there, which will go into the residuary trust for the respective benefit of the life beneficiary and of the residuaries solely by virtue of the indivisible act of probating and establishing the wish that it should ultimately benefit them, among others also remembered in the last will. It is not the practice, and to a large extent impracticable to apportion or allocate any such fundamental expense among all the various interests created or benefited by the will, including tax gatherers, lawyers and funeral directors. None of the expense of the California probate, nor that of obtaining possession of the mov-able property situate there should be apportioned, but should all be borne by the corpus of the estate as a general administrative expense.

3. Some of the ordinary taxes of the California real estate had become liens on January 1, 1933, three months before the date of her will and eight months before the death of the testatrix. While she may not have been liable therefor personally, still they had become liens on her landed interests in her lifetime, and for that reason fall wholly to the charge of the estate at large, to wit, the

residue; and without any right of apportionment, because they antedate the inception of the estate and the erection of the trust therein. (See *Matter of Babcock*, 115 N. Y. 450.) These liens fall in the statutory class of " taxes assessed on property of the deceased previous to his death," which are to be paid as debts in the order of priority defined in subdivision 2 of section 212 of the Surrogate's Court Act.

Mrs. Emery, having paid $7,659.96 of taxes on the California land which had been assessed in the lifetime of the testatrix, is now entitled to credit therefor.

4. As to apportionment of death or estate taxes, the discussion of two points is made necessary by the claim of the person, who is both specific legatee of the land in California, and also the life beneficiary of the residuary trust, that all of the Federal estate tax should be borne by the residuary; and also by the doubt expressed as to whether the executor by allowing that person to take out of this State all the jewelry and personal effects specifically given to her, thereby lost his lien or any right to withhold from her income her portion of the estate taxes apportionable thereto.

The Federal estate tax up until 1930 was payable out of the general estate, without any right of apportionment among the respective beneficiaries; but the Federal estate tax had been so drawn as to leave each State at liberty to determine, by its own statutes, the manner in which the Federal estate tax should be borne by the persons interested in the estate. (See the note of the commission on new section 124 of the Decedent Estate Law, McKinney's Cons. Laws.) Accordingly, and for the relief of the residuary legatees mainly, New York in 1930 enacted the section last mentioned for the apportionment of Federal and State estate taxes, and authorized therein the executor either to deduct the apportioned share from the distribution, or to recover it from the person benefited.

This California legatee took title to the personalty in that State essentially by virtue of the law of the domicile of the testatrix, which was New York, although after the domiciliary probate certain uncontested procedural steps were taken in California to facilitate the liquidation of that portion of the estate which lay in that jurisdiction; and the real estate there passed also by the New York will which was found to be in accord with the laws of that locality.

From the fact that the Federal estate tax as between the estate and the United States government is a tax on the estate as a whole, it does not seem to follow, as this specific legatee argues, that as between the estate and its beneficiaries this tax cannot be apportioned under the New York act. The same observation seems to resolve the ambiguity in the objection that the executor having

alleged in the California proceedings that the Federal taxes were "chargeable to the estate of said decedent now being probated in the State of New York;" and distribution on this basis having been made in California; that the executor thereby estopped himself to apportion this tax as to her under the New York act. The only real difficulty in respect to this Federal tax lies in the method of computing the apportionment of it. The method of apportioning both the Federal and the New York estate tax outlined in Exhibit 23 and explained by the executor in his testimony is the one that should be adopted.

The objectant, Mrs. Emery, being subject to the New York law of apportionment, is thereby made liable to an action to recover the portion of the Federal estate tax allotted to her in respect either of her specific legacy, or of her right to income from the residuary trust. To facilitate a prompt settlement of this estate, and to avoid the delay and expense of pursuing that administrative cause of action in some other jurisdiction, this court under its broadened equity powers will decree that enough of her income may be impounded to fully satisfy this obligation now and be applied thereto, unless sooner met otherwise.

5. The outlays made to preserve the lien of certain mortgages subject now to the Alberta Moratorium Act, as set out in Schedule H, should be temporarily charged to principal, until that matter can be finally adjusted.

On notice to counsel, or on voluntary appearance, submit for signature and enter a decree in accord with this decision.