In the Matter of the Estate of VALENTINE F. WHITMORE, Deceased.

Surrogate's Court, Monroe County, July 17, 1939.

E. *Raines* [*C. J. O'Brien* of counsel], for the petitioners and the estate of H. F. Whitmore.

*R. F. Fowler,* for Lewis Whitmore.

*Harris, Beach, Folger, Bacon & Keating* [*K. B. Keating* of counsel], for the executors, etc., of Eunice E. Vicinus.

*Spencer, Ogden & Spencer,* for Mildred C. Whitmore.

FEELY, S. On this judicial settlement certain parties who have succeeded to shares in the residual corpus of this trust estate now seek to surcharge the accounting trustees who acted up to May, 1938.

The trust was set up in the executors' judicial settlement of July 31, 1924. Testator by his last will gave his widow directly the use for her life of the homestead on Park avenue, and also of the summer residence at the lake shore, with remainder over to their daughter, Eunice E., by marriage Mrs. Vicinus; but after some minor legacies in trust, with remainders over to the general residuaries, the testator placed the general residue of his estate in trust to pay the widow for life a definite part of the income; and any surplus income was to be paid to their four children, who also on their mother's death were to receive the corpus of this trust. These children were three sons, Walter, Lewis and Homer, and a daughter, Eunice E. Vicinus. The three sons qualified as executors; but one of them, Homer G., died in October, 1923. Since his death his branch of the family has not taken part in the estate matters hereinafter mentioned.

In January, 1924, the daughter, Mrs. Vicinus, qualified as a trustee; and upon the decree of July, 1924, two of the brothers,

Lewis and Walter, also qualified as trustees with her. This representation continued until Mrs. Vicinus died on July 12, 1936; and later Walter having died, and Lewis having recently become physically unable, a substitution was ordered in May, 1938; and the trusteeship then passed to a local bank and trust company.

The estate consists mainly of land and stock in a contracting corporation, and certain personal property.

The account of the trusteeship having been filed, objections to it were put in both by the executors of the sometime trustee, Eunice E. Vicinus, and also by Mildred Whitmore, who came to participation in the residue as the daughter and executrix of Homer G. Whitmore, who died in 1923.

The objections to the account are of three kinds — one is that six parcels of real estate were held too long, and became an improper form of investment; another is that the trustees took over two purchase-money mortgages, made by the contracting corporation in the course of land speculation in which two of the trustees, as stockholders in a realty corporation, were personally interested; and a loss was sustained thereby; and the last objection is that the trustees improperly loaned money to the contracting corporation on unsecured notes to the extent of $115,000, which is still outstanding.

I. The six parcels of land are the remnant of a much larger number which testator had held at his death. The power of sale granted by his will is claimed to be such as to forestall any objection in regard to this remnant having been held too long.

By the " Thirteenth " paragraph of his last will testator did " direct that all land contracts into which I have entered shall be performed by my executors and trustees hereinafter named, and for that purpose I authorize and direct my said executors and trustees, or a majority of them, to execute the necessary conveyance of any and all real estate which I have contracted to sell during my lifetime; and I request my wife to join in such conveyances by way of release of her right of dower.

" I further empower my said executors and trustees hereinafter named, who shall qualify and act, or the survivor or survivors of them, at any time prior to the closing of my estate, to sell and convey, in their absolute discretion, the whole or any part of my real estate and personal property and invest and reinvest the proceeds of the same.

" This power does not include the premises on the corner of Park Avenue and Barrington Street, or the premises on the high bank and shore of Lake Ontario, adjacent to Durand-Eastman

Park, except with the written consent of my wife, if living; and the avails thereof being invested and the income paid to her during her life."

The power above quoted seems ambiguous in so far as the " absolute discretion " appears to relate to sales of land, rather than to the investment of the proceeds, especially when this broad phrase is read with the direction of the last sentence that upon a sale of the property occupied by the wife, the avails thereof are to be " invested and the income paid to her during her life." No extraordinary form of investment is specified. Contrast with this the power given to the Brewster executors in *Matter of Brewster* (148 Misc. 390, 397), to sell " and invest the proceeds in other real estate or personal property at their discretion." This language was held, under the authorities, to be too general and indefinite to authorize any material departure from ordinary trustee practice. Aside from the phrase " before the closing of my estate," much of the ambiguity here lies in the fact that the language conferring the power and discretion does not make clear whether testator meant his legal representatives could act without any restraint whatever in following the ordinary course of executorial or trustee practice, or whether he meant could, in either capacity, do extraordinary things, outside the bounds of ordinary practice, and do so with like freedom from any restraint or liability.

The high standards to which a fiduciary is held require that any intention on the part of a testator or settlor to authorize a trustee, in either matter or form, to go beyond the ordinary limits prescribed by law, must be expressed in language that is correspondingly clear and appropriate. Any out-of-ordinary power in a trustee must have been " explicitly " conferred (*Matter of Albro*, 165 Misc. 486); and the grant is strictly construed against the extension of such power. Even before the policy of the State took the form of the statutory declaration (Dec. Est. Law, § 125) that cuts down such broad commitments in the wills of persons dying after the enactment of chapter 378 of the Laws of 1936, the courts had held that the fact that the will gave trustees discretion to invest free from the restrictions of section 111 of the Decedent Estate Law, does not deprive the courts of power to review the exercise of such discretion; and if need be, to correct any abuse thereof. (*Matter of Keane*, 95 Misc. 25.)

It has recently been held that no matter what discretionary power has been conferred upon a testamentary fiduciary, he is bound to employ such diligence in management as prudent men of discretion employ in like matters of their own. (*Matter of Clark*, 165 Misc. 801.)

The " absolute discretion " in these trustees is not as free from the regular trust restraints as, in the literal sense, this phrase might be taken to mean. From the standpoint of explicitness and clearness in defining the extraordinary it is too general and indefinite to take the case out of the ordinary rule, except possibly as to price and terms of sale, within reason. This phrase could not justify holding any parcel of land off the market for an indefinite period of time; nor be taken to authorize extraordinary types of investment, or reinvestment. Certainly this phrase did not authorize the trustees to deal with themselves as individuals, for personal profit.

The conduct of these trustees in regard to these parcels of real estate must be measured up to the ordinary standards. In 1924 the trustees took over about eighteen parcels of improved city land that testator had owned; and the market was favorable until some time late in 1927, when it fell off rapidly; and has remained dull ever since. Eleven pieces were sold at prices above a conservative inventory, and brought a net profit of a little over $75,000. Of the six remaining ones, two lie in the neighborhood of the intersection of South avenue and Alexander street, and the part of Averill avenue nearby. The latter is a wooden, double house, appraised recently at about $13,000, and the former is a large brick block appraised lately at about $38,000. The evidence as to the age, style and condition of these two properties leads to the conclusion that they were probably not readily salable; nor located in anywhere near as good a neighborhood as are the four other parcels now he d in the vicinity of Park avenue and Westminster road. While the executors and trustees did not conduct as intensive a sales campaign as might have been done, still they were not inactive; but did offer the testator's land to various brokers, and made some sales themselves; with the results aforesaid. In this respect it cannot be said that due diligence was not exercised.

The four parcels in the Park avenue section are wooden, residential structures on lots that are contiguous to one another, including the homestead that was occupied until recently by the widow. This home place was lately appraised at $14,000, and the three others together at about $66,000. The will withheld from the trustees power to sell the homestead, unless the widow consented. To forestall the possibility that persons in the next house might be objectionable in the widow's opinion, the property adjacent to this homestead was kept off the market, and only rented out by the trustees. The rentals of the other three parcels appear to have been enough to have carried them and kept them in fair condition. The evidence indicates that these three are so located as to make individual sales inadvisable; and that they are better

adapted toward sale in bulk as a site for an apartment house. The current sales in that neighborhood were mostly on small down payments; and somewhat speculative.

In the circumstances, the evidence does not warrant a finding that the trustees failed to use due care in this respect.

II. The claim of surcharge in the amount of the purchase-money mortgages is based on the conduct of the individuals who had been theretofore acting as trustees and continued to act as such. The three trustees were also residuaries of the trust; and the trust might be said to have been a " family affair;" based upon the estate which their father, the testator, had gathered in the contracting business, in a corporation known as the Whitmore, Rauber and Vicinus Company. After his death his stock in that company became the corpus of the residuary trust. Two of the trustees, Walter and Lewis, were stockholders and officers in the contracting company. A year after the judicial settlement of 1924, two of the trustees, Walter and Lewis, individually organized a land subdivision development corporation under the name of the Whitmore, Rauber and Vicinus Realty Company. Some persons, not relatives, were their associates in the contracting corporation; and these joined the two trustees in this realty enterprise. Those two trustees owned forty per cent of the stock in the realty development corporation; and later came to own two-thirds; and both of them were officers in this realty corporation but the third trustee, their sister, Mrs. Vicinus, was neither an officer nor a stockholder therein. Likewise in the contracting corporation, both of these men, her brothers and cotrustees, were officers and stockholders, together owning forty per cent of its stock; but their sister, Mrs. Vicinus, was neither. She appears in this family picture only as one of the testamentary trustees and as one of the residuaries of the trust, the corpus of which included the st ck of the contracting company.

On her behalf it is claimed she was merely a passive trustee, and that the active trustees were her two brothers, as regards the matters specified in the objections. To examine first what those matters were will throw light on the question of her participation.

The two brothers and the sister, as testamentary trustees under their father's will, took over his stock in the contracting corporation, and also a large portion of his land; and at the same time those three trustees, and the representatives of the deceased son, Homer, were individually entitled to any surplus income of the residuary trust, and were owners of the underlying corpus of this trust. This condition remained unchanged throughout the period of the trusteeship.

During the trusteeship period, both the contracting corporation and the realty corporation acquired certain suburban land in 1925, in the land subdivision boom then prevalent hereabout; and gave or assumed certain mortgage obligations as part of the purchase price of two large tracts of unimproved land, with the exception that on one there was a house. The latter was known as the Opperman mortgage, and the former as the Beckwith mortgage. Mr. Beckwith was unwilling to accept prepayment of the whole debt, or to vary the requirement of his mortgage that part of the proceeds of the sale of lots should be applied on his debt before he would release the lots sold. Thereupon these mortgage obligations were taken over by the trustees as a trust investment, on the advice of legal counsel that the statutory requirements existed. At that time the public improvements in the Brighton subdivision had not yet been completed.

It now appears that in their position in the realty corporation, which had acquired the equity in the lands, the two active estate trustees proceeded to procure local public authorities to authorize public improvements, such as streets, sewers and sidewalks, in the lands covered by the mortgages which now were held by the estate trust; and that then the contracting corporation, in which these two men were also officers and stockholders, succeeded in bidding in those jobs: and upon having completed those improvements, at a substantial profit, their contracting corporation was paid therefor out of the proceeds of public bonds of the respective localities so improved, for the payment of which, with interest, the abutting lots of the realty corporation became subject to liens that were superior to the lien of the two mortgages held by the estate trustees on those two parcels. The objectants charge that the trustees thereby permitted and procured the lien of their mortgages to become subordinate and of less value than before.

While the subdivision lots were being sold, the trustees released from the " Beckwith " mortgage, without financial consideration, the more valuable of the two parcels in one of these developments; and when the sales fell off, the trustees made no effort to collect on the bonds from either of the corporations.

With the collapse of the boom, the land subdivision venture became unprofitable. The holdings of the realty corporation in one parcel were recently lost in the foreclosure of the tax liens, and the public bonds on the other parcel are in default. The estate's mortgage on the foreclosed parcel is now worthless.

The objectants charge that these two men, who were testamentary trustees — with the acquiescence to some extent of their sister,

the third trustee — while the trustees were holding in the estate the contracting company stock, did deal with themselves, at the expense of the trust, through the position they held both in the realty corporation, and also in the contracting corporation, and thus procured the creation of the lien that was paramount to the lien of the estate's mortgage. Thus they were enabled to buy their own purchase-money mortgage, and obviate applying on it any part of the proceeds of the sales of lots when released therefrom; and they were thus able to subject the estate mortgage to the superior lien of the public improvements which they themselves had put in through their contracting corporation.

This lien ultimately destroyed both the value of one of the mortgages when the speculation in land came to its end, and also impaired the value of the other mortgage.

In such a course of conduct the corporations cannot be regarded as independent entities with whom these trustees were dealing " at arms' length," as with strangers; nor can the two purchase-money mortgages be regarded as permissible for trustee investment independent of the foregoing circumstances in which these mortgages were created and purchased. From the outset of the venture, those two mortgages were simply a part of the plan to purchase vacant land, to subdivide and improve it and sell the lots, in the manner above described.

To justify such transactions there would be needed a grant of power in terms far more specific than is the ambiguous power given the executors and trustees in this last will to " sell and convey, in their absolute discretion, any part of my real estate and personal property, and invest and re-invest the proceeds of the same." The two brothers, Lewis and Walter, became liable to surcharge in the amount of this loss.

Their sister was, to a large extent, a passive trustee in respect of many of the estate transactions. She was not in sole possession of the trust assets. They were held and handled by her two brothers, from the contracting company's office. There is no evidence that she took any active part either in planning or in effectuating the lot subdivision ventures in Brighton or in Irondequoit; although later on she joined the other trustees in releasing some lots in the Bel-Air subdivision in Brighton. In the annual reports rendered her by the other trustees in the years 1926 and 1927 there is listed as a trust asset a $36,750 mortgage by " Whitmore, Rauber and Vicinus;" but this item is carried in the report for 1928 as the " Beckwith " mortgage; and was so carried in the reports for the ensuing ten years of her life. The latter description was somewhat

misleading. The former was more apt to put an estate trustee upon notice. She had not participated in the giving of that corporate mortgage to Beckwith, nor in taking it over by assignment, and the labeling it as the "Beckwith" mortgage may have lulled her into the belief that he was the mortgagor. The trust estate held the mortgages of many individuals. In the report for 1928 the other mortgage, the one on the subdivision in Irondequoit, for $10,000, is described as the "Opperman" mortgage; and is so carried through the rest of her life. She had not actively participated in the giving of that mortgage.

There is no direct evidence that she knew of the way the two corporations were operating in either tract of land; although it can be inferred that she must have had a general idea that the contracting company was making some money in those developments. This seems hardly enough to show she knowingly participated or acquiesced in the unauthorized action her two cotrustees were thus engaged in under the cover of the corporate form of those enterprises. She is not liable to surcharge in respect to those two purchase-money mortgages.

III. In the judicial settlement of 1924 it appeared that the estate had already loaned the contracting company the sum of $35,000 on its unsecured note. The decree probably barred any complaint as to that amount. In the private accounts thereafter rendered yearly as aforesaid this matter is variously entered and described. In the report for 1924 it is listed as the note of "Whitmore, Rauber & Vicinus;" but for the next ten years it appears simply as a "note," in increasing amounts, except that in the years 1933, 1935 and 1936 it again is described as the notes of "Whitmore, Rauber & Vicinus." By 1928 there had been $25,000 more likewise advanced; and by like loans a total of $110,000 was reached in 1929.

In 1937 the objectant Mildred C. Whitmore brought this matter to a head; and then two of the trustees, Walter and Lewis, together with William Vicinus, a son of Eunice E. Vicinus, made an agreement (Exhibit 45) with her wherein they personally guaranteed payment of all the notes; and assigned to her as collateral thereto their interest in the estate as residuary legatees under their father's will.

There is no question as to those two trustees, Walter and Lewis, being liable to surcharge for the full amount of the notes — including by virtue of the guaranty agreement (Exhibit 45) the initial $35,000 — with interest on all of them.

However, on behalf of the two trustees, it is now claimed that their cotrustee, Mrs. Vicinus, is liable also. In the agreement

guaranteeing those notes, the promisors recite the claim was being made that she had nothing to do with the making of those loans; and they also declared therein that the agreement should not be deemed to be a release of any liability she may have incurred by reason of said loans and the non-collection thereof.

As was the case in the yearly reports as to the two purchase-money mortgages, so here likewise this note item was correctly labeled in the decree of judicial settlement of 1924 and in the report for the year ending January 1, 1925; but in the next nine years each report merely lists a "note" for a definite amount. By the time the correct labeling was resumed in 1933, and especially in the years 1935 and 1936, she had become more and more physically disabled and retired; and took even less than the little part she had taken before in estate matters. This method of reporting to her a transaction in the initiation of which she had not taken active part was not likely to put her on notice as a trustee, until after practically all the loans had been made. Her brothers visited her frequently, but what they talked over with her has not been shown. She probably came to know, as her income lessened, that things were not going so well with the contracting company as they had before; but there is nothing definite showing she knew of the increased loans made by her cotrustees to the contracting compay, nor acquiesced in them. She is not liable to surcharge in this respect.

On notice or appearance by counsel submit for signature and entry a decree in accord with this decision.