PUBLIC SERVICE COMPANY OF COLORADO, Plaintiff,

v.

The CHASE MANHATTAN BANK, N.A., Defendant.

No. 78 Civ. 4697 (JEL).

United States District Court, S.D. New York.

July 20, 1983.

Supplemental Opinion Dec. 8, 1983.

Reid & Priest by John M. Nonna, New York City, for plaintiff.

Milbank, Tweed, Hadley & McCloy by Michael J. Levin, New York City, for defendant.

## OPINION

LUMBARD, Circuit Judge: *

Plaintiff, the Public Service Company of Colorado (PSCC), brought this diversity action against The Chase Manhattan Bank in 1978. PSCC charges that Chase breached its fiduciary obligations as trustee for PSCC's pension fund—that Chase negligently monitored a mortgage investment it had made on behalf of PSCC and sixteen other pension funds. Consequently, Chase was unable to bring an overall and know-

* Sitting by designation.

ledgeable judgment to the decision whether and how to sell the loan at a time when Chase knew or should have known the loan had become an imprudent trust investment. The investment eventually declined to a fraction of its original worth. Plaintiff claims damages in excess of $300,000.

This Court conducted a seven-day bench trial ending on December 1, 1982. For the reasons stated below, the Court finds Chase liable for PSCC's loss.

Chase failed to respond in any way to early indications that the condition of the mortgaged property was deteriorating. In general, it inspected the property much too infrequently and collected superficial reports from such inspections as it conducted. From the late sixties on, the property, a large apartment complex, suffered poor maintenance. Conditions deteriorated steadily, culminating in near total uninhabitability by the time of trial. By no later than late 1973, Chase could no longer count on the continued viability of the complex under its then current debt structure, and the unsuitability of the mortgage as a trust investment should have been apparent. However, Chase failed to recognize the situation because of its negligence in monitoring the loan. Consequently, between 1973 and 1975, Chase failed to take reasonable steps to sell the loan at a price reflecting the deteriorated condition of the underlying security. Had Chase taken reasonable steps, it would have sold the loan by mid-1975 at a twenty percent discount. Accordingly, Chase is surcharged in the amount for which the loan could have been sold, plus interest, with appropriate set-offs for subsequent payments of principal and interest.

## I. FACTS

PSCC appointed Chase trustee of its pension fund by a July 1, 1952 agreement, which gave Chase sole power to make investments for the fund. PSCC retained no right to control the making, retention or disposal of trust investments. On January 29, 1964, Chase made the $4.7 million Glassmanor loan as trustee for 17 pension funds and gave PSCC a 3/47ths share, or $300,000. The loan was approved by Chase's Real Estate and Mortgage Loan Committee and the Pension Trust Investment Committee,[1] composed of individuals experienced in trust management. The mortgage was payable over 15 years, with a maturity balance of $2.5 million, commonly called a "balloon balance." It was secured by the Glassmanor apartments, a then thirteen year old complex consisting of approximately thirty buildings and 771 apartment units, conveniently located near downtown Washington, D.C., in Prince Georges County, Maryland. At the time the loan was made, an independent appraiser found the apartments in generally good condition and valued them at $6.8 million, providing a 69% loan to value ratio. Income was more than adequate to pay debt service.

Both the Real Estate Department and the Trust Committee were responsible for managing the Glassmanor investment. Under Chase's policies, the Real Estate Department was responsible for inspecting the complex every eighteen months and for reappraising it every three years. In accordance with the regulations of the Comptroller of Currency, Chase also required the Trust Committee to review the mortgage yearly or within fourteen months of the last review.[2] Although review sessions

---

**1.** The Pension Trust Investment Committee and its successor, the Chase Institutional Investment Committee, are referred to here simply as "the Trust Committee."

**2.** The Committee also reviewed PSCC's entire investment portfolio on an annual basis. These sessions did not serve as adequate substitutes for the yearly reviews of individual mortgages required by the Comptroller's regulations. No mortgage review sheets were prepared for portfolio reviews, and such reviews were not generally attended by a member of the Real Estate Department. There is no indication that the Committee would be likely to focus on individual investments such as the Glassmanor loan in any significant detail. Likewise those meetings at which the Trust Committee approved fire loss drafts were not adequate substitutes for the yearly mortgage reviews required by Chase's policies and the Comptroller's regulations.

were attended by a member of the Real Estate Department, the Trust Committee relied almost entirely on the information contained in the "mortgage review sheets" prepared by the Real Estate Department. The committee did not review the underlying inspection and reappraisal reports on which the review sheets were based.

Between 1967 and 1970 Chase received indications that the property was being poorly maintained, was subject to vandalism and was in need of remodeling. In January, 1967, Harold Nyhus, who had appraised the property for Chase in 1963, reported that he had learned during an October 1966 fire inspection that Glassmanor suffered over one hundred vacancies. Nyhus visited the apartments again in January, 1967, and found that there were 120 empty apartments, for a vacancy rate of 15.5%. He reported that the manager claimed to have advised the owner that increased vacancy might be avoided by remodeling the units in one building where the majority of the vacancies occurred.

By letter dated January 16, 1967, the owner requested a two month moratorium to finance a $50,000 pilot remodeling project in one of the buildings with the poorest occupancy. The owner noted that remodeling was necessary to make the somewhat obsolete apartments competitive with new apartments in the area. In addition to increasing occupancy, remodeling would permit rent increases which would provide a gain in income of $7,500 per year for each remodeled building. If the project were successful, the owner proposed to convert approximately "20 of the ... buildings in the same manner." Total cost of remodeling twenty buildings would have been about $1 million.

By letter dated January 24, 1967, Chase's Second Vice President, Norman Caridi, informed the owner that Chase was aware of the conditions the owner had reported. Caridi wrote, however, that after reviewing the request personally and discussing it with various members of the committee, "we cannot see how it would be possible for us to provide the necessary equity money required for the rehabilitation of the pilot building, for to do so would presume that similar requests would be made with respect to the other apartments." Chase inspectors noted some progress in 1968 and 1969; however, it appears that three-fourths of the apartments were never remodeled. In 1969 when the property was sold to the Wisconsin Real Estate Investment Trust (WREIT), the new owner proposed to spend $1 million upgrading the complex. It does not appear that any significant upgrading ever occurred.[3]

In addition to receiving indications in the late sixties that the property was in need of modernization, Chase was alerted to a vandalism problem. In 1969, after viewing repairs to a fire damaged storage bin, an inspector recommended that Chase ask the owner to install adequate lighting in the area. The owner informed Chase that this would not be possible because the property was plagued by an "overbearing amount of vandalism." The owner noted that at one time it had installed better lighting, "only to have it broken, torn out and generally dismantled the following morning." Chase failed to respond. It made no effort to determine whether the owner was taking care of the problem.[4]

Chase was also alerted to the fact that the complex was not being properly maintained. Chase's 1968 inspection report noted that several public halls had been paint-

3. Although it is true that vacancy levels appear to have peaked in late 1967 and declined to one or two percent between 1970 and 1973, the unremodeled apartments apparently rented for less than competing apartments in the area; the decline in vacancy in no way shows that the owner's modernization proposal was unnecessary to the long term viability of the complex.

4. Chase argues now that there could not have been a significant vandalism problem in 1969, otherwise the WREIT would not have paid $5.3 million for the apartments. However, the fact that WREIT paid a price representing a decrease in the value of the apartments and planned to spend a million dollars improving them is not inconsistent with there being a vandalism problem deserving attention and requiring the expenditure of capital.

ed and that the exterior trim was in need of paint. Chase's 1969 appraiser apparently found the trim and the public halls still in need of paint. His report noted that "[a] maintenance program ha[d] been instituted regarding the painting of building trim and public areas"; "approximately 42 halls out of 124 ha[d] been completed and a contract regarding the painting of trim and facade ha[d] been signed."

The next inspection report on October 9, 1970, showed that the "maintenance program" had not been carried out; the "[p]ublic halls, exterior trim and window moldings [were still] in need of painting." More significantly, the inspector found the property in only "fair condition"[5] and noted that "[a]dequate maintenance appears generally lacking."[6]

Chase failed to respond in any way to the indications that the property was not being properly maintained. Indeed, in violation of its own policies it failed to review the loan in 1971 and 1972 and after 1970 failed to conduct its regularly scheduled inspections for five years.[7]

The only reliable testimony at trial concerning the property and neighborhood during this crucial period was from plaintiff's witness Joseph Murray. Murray had managed the Glassmanor apartments for several years, from their completion until 1955. He subsequently joined a real estate firm which, beginning in the mid-sixties, managed two new complexes adjacent to Glassmanor.

Murray testified that during the mid- to late-sixties, maintenance at Glassmanor "slipped badly"; it failed to keep up "with the fact of life that there were people moving in and out of the development." Consequently, the complex did not "remain as desirable a place to live as it had been." The exterior appearance of the apartments did not attract new tenants, especially those "who had some pride in their home."

The racial and socio-economic composition of the Glassmanor neighborhood changed about this time. Murray testified that although the high turnover required particular sensitivity to maintenance, "[i]t appeared ... that the management or the owner's attitude was that if this place is going to be going, if you will, downhill because we are changing race, then there's not much point in keeping it up ..."[8] By the late sixties, the complex "showed signs of heavy wear and tear and poor maintenance particularly in public areas." Murray saw "the beginning of abandoned cars, cars sitting up on blocks, indicating a serious decline in the level of tenancy and the management's response."

Murray also testified that the racial composition changed at similar properties in the area. However, where management was responsive to the situation, the properties did not experience as significant a decline as Glassmanor.

5. The paucity of detail in these reports makes them difficult to interpret. In 1963 the property was reported in "generally good condition," in 1968 in "satisfactory condition," and in 1969 in "fair condition," suggesting a downward trend. This inference is supported by the fact that the 1970 inspector described the condition as "fair" even as he noted that adequate maintenance was generally lacking. Similarly, the 1976 appraiser noted that the property's condition was "fair for age" even though it suffered serious vandalism and excessive vacancy due to widespread roof leakage.

6. When a mortgage review sheet was prepared for the Trust Committee in 1971, these cryptic comments were further abbreviated and distorted. The review sheet simply noted that an October 1970 inspection had found the property in "satisfactory condition," with eleven vacancies.

The maintenance problems noted at the apartments were not communicated to the Trust Committee.

7. Fire loss inspections during this interval were conducted for the limited purpose of reviewing repairs after small fires. These inspections were in no way adequate substitutes for inspections necessary to monitor the condition of the entire property.

8. Owen, a member of the Real Estate Department, who attended the Trust Committee's Mortgage reviews, testified that in the late 1960's, or perhaps the early 1970's, he had been informed by Nyhus of the racial and socio-economic change in Glassmanor's tenancy. However, because of the "sensitivity" of this point, it had not been brought to the Trust Committee's attention until later.

Murray testified that by the early seventies he would occasionally see boarded-up windows at the basement level; he saw more and more abandoned cars and noted the lack of sweeping and cleaning on the parking lots around the complex, "almost as though ... the place ... wasn't being managed for habitability." During the seventies, deterioration and decline in habitability spread like a "cancer" across a project "that once was a very fine place to live."

Murray's testimony is supported by other evidence. In July 1971, inspectors from the Prince Georges County Department of Licenses and Permits visited the property. They found over one hundred building-code violations.[9] They found that "[w]alkways, parking lots, steps, curbing and retaining wall[s] throughout the complex are deteriorated and in a state of disrepair"; "[e]xterior premises around numerous structures have high weeds and are littered with trash," and "[b]enches throughout [the] complex are in a state of disrepair, and/or the wood and metal surfaces are exposed to the weather." The violation notice also reported fences in disrepair, broken windows, doors that did not fit within their frames, trash in numerous window wells, light fixtures in disrepair, numerous leaking roofs and holes and cracks in exterior walls. Finally, as Chase personnel had noted in 1968, 1969 and 1970, the exterior trim was in need of paint. Inspection of interior public areas revealed a great deal of flaking paint, holes in walls and ceilings, broken glass, missing floor tiles, stairs in disrepair and numerous storage rooms with accumulations of trash. The inspection of individual apartment units revealed more flaking paint, numerous cracks and holes in walls and ceilings, numerous bathroom defects likely to cause water leakage into apartments below and numerous other violations. The County inspectors continued to cite the apartments throughout the remainder of 1971 for similar violations.

The same year, the Trust Committee decided to dispose of four to five hundred mortgage loans it held as trustee, because of the low yield and illiquidity of such investments. Steven Owen, a member of the Real Estate Department who had no prior experience in selling mortgage loans, was given the responsibility for disposing of the investments. He offered the loans to savings and thrift institutions and mortgage bankers in the New York area.

In May of 1971, Chase arranged to sell the Glassmanor loan to the New York Bank for Savings as part of a package of 75 mortgages for a total price of about $35 million. The Glassmanor loan was priced at about $3.3 million, representing the discount to present value of the future payments on outstanding principal and interest. On June 10th, the New York Bank returned the Glassmanor loan to Chase, under a provision of the purchase agreement requiring Chase to repurchase any loans "declared unsatisfactory because of appraisal qualifications or other matters impairing the securities of the loans in question."

Meanwhile, as Murray testified, the property continued to deteriorate. During 1973, County inspectors visited the property several times and reported hundreds of violations. Indeed, by the time of Chase's 1973 reappraisal, County inspectors had noted public halls and windows so dirty as to be unsanitary; holes, cracks and breaks in walls, ceilings and floors of several apartments; numerous cases of water damage to ceilings; broken windows and broken walkways.

Chase reappraised the property in June, 1973, a year late according to its own policy. The reappraisal report failed to provide any data on comparable properties in the area, an especially problematic omission given that Chase did not operate a field office which might have provided continuous information on market conditions. More significantly in the circumstances es-

9. The Court rejects defendant's wholly unsupported speculation that the violation notices were "clearly the product of an official harass-ment program" somehow connected with change in the "racial composition of Prince Georges County."

tablished by the evidence, the report, like those preceding it, gives too little detail to permit Chase officials to form an intelligent opinion as to the condition of the property generating the reported figures for expenses and income.[10] Indeed, the report simply states that "[s]ubject property suffers more from general wear and tear due to age rather than anything specific..." The report notes three apparently random details from the large variety of circumstances prevailing at a complex of Glassmanor's size: "B & C boilers do require some repair for leaks and missing insulation. Also correct a leak in the laundry room at 359 Irvington and patch the sidewalk in front of 349 Irvington." This reappraisal report was a wholly inadequate substitute for the more thorough inspection report Chase needed in order to keep abreast of the situation.

Five months later, when the County sent its thirteenth Glassmanor violation notice of 1973, it listed 284 violations. The notice provides a compelling picture of the deteriorating state of the complex and a clear sign of what was to come. The notice reported generally that the exterior public walkways and parking lot curbing throughout were in disrepair; the "[l]aundry rooms, storage areas, boiler rooms and basement areas throughout have cracked and missing window panes" and "hazardous accumulation[s] of wood, debris and trash," and laundry rooms throughout suffered the pervasive water damage noted elsewhere in the complex. Inspection of some of the individual buildings revealed many violations for peeling and flaking paint in public hallways; numerous broken windows; numerous entry doors in disrepair; several buildings whose exterior premises were littered with trash, debris and uncut grass and weeds; many inoperative light fixtures; storage areas and laundry rooms with holes in the walls; entry steps in disrepair; eroding groundcover and dozens of other violations. Inspection of several individual apartment units revealed thirty eight instances of cracked plaster or flaking paint, several doors in disrepair, broken windows, leaking plumbing, water damage to ceilings, electrical outlets in disrepair, numerous bathtubs with inadequate caulking and many other violations.[11]

The Court finds on the basis of all the evidence that the apartments were, as Murray testified, not being maintained for habitability, that they were not in "satisfactory" or "fair" condition, and that the 1973 report that the project suffered from "wear and tear due to age" was a wholly inadequate appraisal or description of the situation.

Had Chase responded with appropriate inquiries when it learned that the neighborhood was undergoing a racial and socio-economic transformation and that maintenance at the complex was poor, or had it conducted the reasonably thorough inspections called for by its own policies during the interval from 1970 to 1975—inspections necessary to monitor a situation 200 miles from Chase's offices—it would have learned of many of the highly visible problems evidenced by the violation notices. Chase would have learned that the property was in need of considerable repair and

---

10. The Court finds unpersuasive the contrary opinion of Chase's expert from Equitable, especially given the difference between Equitable's field office system and Chase's attempt to monitor the property from headquarters hundreds of miles away.

11. Handwritten notations on the violation notices indicate that a majority of the violations were cured within a few months after the notices were delivered. Defendant argues that these notations are evidence that the owner was making adequate efforts to maintain the property. However, the fact that the complex was cited repeatedly for hundreds of violations for the same type problems over a several year period indicates not that management was keeping up, but that its efforts to maintain the property were insufficient—management was making the minimum effort to respond to those specific matters called to its attention by County authorities through notices backed by the threat that the County would revoke the license to run the apartments. A great many of those matters not called to its attention were apparently left unrepaired until they were perchance discovered during the next round of inspections and violation notices.

that the future profitability of the complex under the then current debt structure was uncertain, rendering the investment improperly speculative for a trust fund. Despite the realities, when the Trust Committee met to review the loan in September, 1973, after a two year hiatus, it had before it a mortgage review sheet based on the inadequate reappraisal for 1973 and bearing the notation that the property was in "satisfactory condition." At the 1974 mortgage review, since the Real Estate Department had still not performed an inspection, the Trust Committee relied on the same erroneous information.

Thus, notwithstanding the deterioration of the apartments, Chase made no effort to dispose of the mortgage at a discount reflecting the condition of the property. Although, according to Owen, the market for mortgages was active during the early seventies, Chase failed to sell the loan.

Throughout 1975, County inspectors cited the apartments for the same sort of violations noted in 1971 and 1973. Three apartments were found to suffer extensive water damage from leaking roofs, and one apartment so affected was placarded as "unfit for human habitation." County inspectors also reported holes, cracks and sections of deteriorated plaster, flaking paint, broken windows and water ruined floors.

Chase, conceding that the property deteriorated at some point before 1977 offered the testimony of John Elliot to show that significant deterioration had not occurred prior to 1975. At the time of his March, 1975 inspection, Elliot had been apprenticed to an experienced Chase appraiser for about three and one half years. He had no relevant prior experience. He had not been to the Glassmanor apartments before. He reported that the apartments were in fair condition, "all things considered."

The Court finds that Elliot operated under an assumption similar to that which Murray attributed to the Glassmanor owners in the early seventies—that substantial disrepair was the acceptable norm for an apartment complex inhabited by black lower-middle income families. Elliot's 1975 report noted that the halls of the complex were in "fair condition," considering that they were "subject to cracking and abuse by children." Elliot testified that he saw a minimal amount of broken glass at the complex, considering the number of windows, the number of children and the number of people coming through the complex. What he meant by a "minimal amount" is not clear, since he testified that he saw broken glass in sixteen or eighteen buildings. He testified that the trim was in fair condition, although the trim within the reach of children was in need of work and there were areas on the trim near the roof that needed attention. Finally Elliot noted that landscaping was a problem in a number of areas where there were, he presumed, an unusually large number of children.[12]

In addition, the Court does not credit Elliot's claim that he specifically recalls the absence of torn-up benches, abandoned cars, boarded-up windows, accumulations of trash, or deteriorated walkways and parking lots at the property in 1975. In sum, the Court gives little weight to Elliot's assessment of the conditions at Glassmanor in view of his high tolerance for poor maintenance, his unfamiliarity with the property and the abundance of more persuasive evidence concerning the deteriorated state of the complex.[13]

12. The Court finds Elliot's report of the occupancy level indicative of his care in scrutinizing conditions. He testified that when he asked management about the matter, he was told "there were a few vacancies." Elliot dutifully noted in his report that there were "a few vacancies." He did not ask for and did not receive a rent roll to verify the matter. Elliot testified that for a complex of 771 apartments, he would think that a few vacancies meant ten or twenty.

Management apparently reported to Chase that there were 53 vacancies as of April, 1975, and 115 vacancies by the end of the year.

13. In January 1976, nine months after Elliot found the property in "fair condition," the County inspectors sent the owners notice of 106 violations. The notice reported that benches, walkways, entrance ways, driveways, parking lots and curbing were in disrepair throughout

In early 1976, the owner offered to buy the loan at an approximately twenty percent discount. Although Owen recommended that the Committee accept an offer from the owner at a twenty percent discount, the Trust Committee thought the discount too great. Chase wrote to the owner rejecting the offer, and Owen told the owner in April that the Committee was unwilling to sell the loan at a discount at that time.[14]

In August, 1976, the Glassmanor loan was once again offered to the New York Bank for Savings. However, after inspecting the property the Bank elected not to purchase the loan.

In October, 1976, the owner notified Chase that the complex needed major capital improvements, including repairs for the problems the prior owner had proposed to correct by remodeling in 1967 and many of the problems repeatedly cited by County inspectors. About the same time, a Chase appraiser found the apartments "suffering from an excessive amount of vandalism." He found that "[d]ue to a roof leakage problem, the [apartments were] suffering from an excessive vacancy." The appraiser also noted the need to paint trim, to clean exterior brick, to replace lawn sod, to repair potholes and to improve security. In November of 1976, after years of silence, Chase asked the apartment manager to make the necessary repairs.

In February, 1977, County inspectors notified the Glassmanor management of 149 housing code violations. The violation notice catalogues in considerable detail the continuing deterioration of the property, the prior course of which had been described in the violation notices of 1971, 1973, 1975 and 1976. Most of the benches throughout the project were in disrepair; the roof drainage to most buildings was inadequate due to downspouts in disrepair; accumulations of trash, broken glass, car parts, etc. could be seen throughout the project; the exterior wood and metal surfaces were weather exposed, indicating long neglect; window wells and tops of canopies over entrance doors throughout the project had accumulations of trash and rubbish; most front entrance doors had broken latches and did not fit within their frames; most glass panels on entrance doors were broken; wall panels near entrance doors throughout the project had holes and cracks; light fixtures were in disrepair; paint was peeling and cracking in hallways throughout the project, basement areas were in an unsanitary condition due to an accumulation of trash, rubbish, etc.; hallway floors throughout the project were unsanitary, and some laundry and storage rooms throughout the project had accumulations of water. In addition to this general description, the February notice

---

the project. The inspectors reported "[i]nadequate roof drainage to most buildings throughout the project due to [the fact that] downspouts are in disrepair," a condition noted in violation notices as early as 1971. The report noted that, as had been the case in 1973, the front doors to most buildings throughout the project did not fit within their frames; the paint was peeling in public hallways in buildings throughout the project; basement areas, including storage, laundry and unused trash rooms in most buildings throughout the project had accumulations of trash, rubbish, wire, lumber, abandoned appliances and furniture. The report also noted the by now familiar list of problems in individual apartments, peeling paint, cracked walls, broken windows, missing stair rails, broken light fixtures, broken stairs, unsanitary hallway floors and walls and numerous other violations, all evidencing the long period of neglect documented by the record. Throughout 1976, additional violation notices reported such conditions

in individual apartments as loose plaster, peeling paint, broken electrical fixtures, water leakage, deteriorated floors and counters, etc.

**14.** A letter from Chase to the owner stated Chase would consider a more "reasonable offer," and Owen's contemporaneous notes indicate that the Trust Committee would consider a firm offer to refinance.

In February 1977, the Trust Committee declined a second offer by the owner to purchase the loan at a 20% discount and directed that a counteroffer be made. On March 23, the Committee determined that it would consider a sale to the owner at 94¢ on the dollar. However, the owner could not obtain financing. Negotiations continued throughout the year, and in June, Chase agreed to sell the loan to the owner at a 10% discount. Again, the owner could not obtain financing.

listed 116 serious and minor violations in many individual buildings.

In March, 1977, three Chase inspectors visited the property. They found the complex in critical condition. They found 43 apartments declared unfit for human habitation. The vacant apartments had been subject to extensive vandalism. Windows, doors, walls, ceilings and bathroom and kitchen fixtures had been broken. Open doors and windows had allowed water pipes to freeze and break, causing further damage.

The inspectors recommended that Chase work closely with the manager to keep abreast of developments, request weekly or monthly reports on progress in rehabilitating the complex and correcting the violations and obtain written documentation after each unit and violation was cured. The inspectors also recommended that Chase consider "discount[ing] . . . and/or sell[ing] the mortgage." They noted that "[a] future inspection is a must and should be scheduled for June 1977," three months later. These recommendations came too late.

In November, 1977, the owner defaulted on the payment of principal and interest. Real estate taxes were then in arrears. Foreclosure proceedings began in early 1978 and were then suspended during negotiations over a modification and extension of the loan. Over PSCC's objection, Chase made a modification and extension agreement with the owner in February 1979, under which the owner subsequently defaulted. As of April of 1983, six out of every seven apartments were vacant. For the three month period ending December 31, 1982, the apartments generated a net operating income of $3,000 before mortgage debt service or real estate tax. As of December 31, 1982, accounts payable amounted to over $800,000. In May, 1983, Chase sold the mortgage for $1.1 million, about 38¢ on the dollar, not including accrued and unpaid interest totaling approximately $500,000.[15]

## II. BREACH OF FIDUCIARY DUTY

The amended trust agreement provides that it will be "construed, regulated and administered under the laws of the State of New York and the Trustee shall be liable to account only in the courts of that state, or in the courts of the United States for the Federal judicial districts within that state." The parties apparently agree that New York substantive law governs this diversity action.

### A. The Standard of Care

Chase argues that the trust agreement granted it "uncontrolled" and "sole discretion" over the exercise of investment powers and that this language released it from the prudent investor standard ordinarily applicable to a trustee's conduct. The Court disagrees.

■■■ Leaving aside the question of whether a waiver of liability for ordinary negligence would be enforceable here, see Mitzner v. Jarcho, 44 N.Y.2d 39, 44–45, 403 N.Y.S.2d 490, 374 N.E.2d 388 (1978) (recognizing a strong public policy in favor of holding to high standards those who perform as fiduciaries for pension funds), the Court notes that New York courts construe exculpatory provisions narrowly to avoid erosion of the fiduciary duty. Matter of Durston, 297 N.Y. 64, 71–72, 74 N.E.2d 310 (1947). Thus, a trustee will be "relieved of liability if he commits a breach of trust only to the extent to which it is clearly provided that he should be relieved." III A. Scott, Scott on Trusts § 222.2, at 1775 (3d ed. 1967). The Court will not strain the language of the agreement to find an exculpatory provision neither fairly implied by the language nor consistent with the relationship between the parties.

---

**15.** Information concerning the current condition of the property and the recent sale of the loan comes from letters sent by Chase during April and June, 1983, to the United Bank of Denver, which succeeded Chase as trustee for PSCC's pension fund in September 1975. The letters were admitted in evidence as defendant's exhibits on June 27, 1983, per a stipulation of the parties to reopen the record.

Cases finding a contractual waiver of the prudent investor standard have typically relied on contractual language explicitly providing not simply that the trustee shall have "uncontrolled" or "absolute" discretion but also that the trustee shall not be liable for losses resulting from the imprudent exercise of that discretion. *See, e.g., April v. April,* 272 N.Y. 331, 339, 6 N.E.2d 43 (1936) (trust agreement provided trustee liable only for "wilful malfeasance"); *O'Hayer v. de St. Aubin,* 30 A.D.2d 419, 430, 293 N.Y.S.2d 147 (1968) (trust agreement provided that the trustees "are expressly exonerated from all liability and responsibility in connection with any ... sale [permitted by the agreement]"); *Matter of Howard,* 110 A.D. 61, 63, 97 N.Y.S. 23 (1905) (agreement provided trustee liable only for "wilful default"), *aff'd mem.,* 185 N.Y. 539, 77 N.E. 1189 (1906); *Matter of Jarvis,* 110 Misc. 5, 9, 180 N.Y.S. 324 (Sur.Ct.1920) (agreement provided that trustee liable only for "gross neglect or wilful malfeasance"); *Stark v. United States Trust Co. of New York,* 445 F.Supp. 670, 683 (S.D.N.Y.1978) (trust agreement "specifically authorize[d] the Trustee in its absolute discretion to retain any property received in the Trusts ... and expressly provide[d] that the Trustee will not be subject to criticism or surcharge for so doing"); *see also Heyman v. Heyman,* 33 N.Y.S.2d 235, 240 (Sup.Ct.1942) (trust agreement specifically granted "widest possible powers ... to enter into speculative transactions").

■ Chase's argument rests on the language of the 1952 agreement providing that the powers granted to the trustee "shall be exercised by the Trustee in its *uncontrolled discretion* " (emphasis add-

ed). The agreement nowhere provides the additional language relied upon by the cases—language expressly limiting Chase's liability for imprudently exercising that discretion or providing that Chase will be liable only for gross negligence or recklessness. To the contrary, Article Nine of the agreement provides that Chase will be liable for "its own negligence or wilful misconduct." Thus the contract appears on its face merely to grant Chase sole authority to make and retain reasonably prudent investments, free from the interference of the beneficiary, PSCC.

This reading of the 1952 agreement is consistent with the phrasing of the 1973 amendments. The first paragraph of Article Five was amended to read "Except as hereinafter provided in paragraphs B and C of this Article Fifth, the powers listed in Article Fourth of this agreement shall be exercised by the Trustee in its *sole* discretion" (emphasis added). Paragraphs B and C permitted PSCC to direct investment decisions or to appoint investment advisors to direct investment decisions, and Chase was absolved of liability for following such directions or for losses caused by "the failure of the company to give such direction." The language making Chase liable for its own negligence or wilful misconduct was retained. The Court finds that under the amended agreement, Chase had a duty to exercise ordinary prudence in managing those investments which were left in its sole discretion. And from 1973 until at least mid-1975,[16] the circumstances required and the parties intended that Chase would retain sole management responsibility as trustee for the Glassmanor loan until such time as the loan could be sold or the "balloon balance" refinanced.[17]

**16.** The Court's findings, discussed *infra,* that Chase violated its fiduciary duties by failing to sell the loan before June 1975 makes it unnecessary to decide whether Chase retained responsibilities as trustee for managing the loan after June 1975, when Chase was terminated as trustee for at least the bulk of PSCC's pension fund and United Bank of Denver became successor trustee; however, the Court would have to scrutinize carefully Chase's arguments that later agreements to which PSCC was not a party

relieved Chase of liability for decisions that only it could make. For the same reason, the Court finds it unnecessary to respond to Chase's argument that PSCC cannot sue under a September 1975 agreement between Chase and United Bank of Denver as successor trustee for PSCC.

**17.** As Chase officials more or less conceded, because Chase remained the trustee for numerous other trusts participating in the Glassmanor loan, it was impossible as a practical matter for

Nothing in the record regarding the relationship between the parties suggests that PSCC intended to relieve Chase of the ordinary standard of care in managing the pension fund. Indeed, given Chase's position as a professional trustee and PSCC's duty to guard the pension fund against loss, it would have been anomalous for PSCC to accept an agreement which did not guarantee that Chase would act with reasonable prudence and take reasonable steps to stay apprised of the security of investments—a task Chase held itself out as especially competent to perform.

Accordingly, the Court finds that, at least until mid-1975, Chase was bound as trustee for PSCC to employ "such diligence and such prudence in the care and management [of the investment], as in general, prudent men of discretion and intelligence in such matters, employ in their own like affairs." *Matter of Bank of New York*, 35 N.Y.2d 512, 518–19, 364 N.Y.S.2d 164, 323 N.E.2d 700 (1974).

### B. *Chase's Duty to Monitor and Dispose of the Loan*

Chase's responsibilities as trustee did not end with the initial decision to invest trust monies in the Glassmanor loan. If a trustee invests in a mortgage on real estate where the security was adequate at the beginning of the investment, "he cannot assume that this condition will necessarily continue throughout the trust." G. Bogert, *Trusts & Trustees* § 684, at 143 (Revised 2d Ed.1982). Chase was bound "to be watchful, keep [itself] informed as to whether or not a depreciation in the value of the security is taking place from any cause, ... and *in fine* to keep [itself] informed and take notice of all those things affecting the investment which a man of fair judgment, care and prudence would

take and keep in consideration in the matter of a loan of his own moneys." *In re Stark's Estate*, 15 N.Y.S. 729, 731 (Sur.Ct. 1891). *See Restatement (Second) of Trusts* § 231 (1959); Scott, *supra*, § 231, at 1882; Bogert, *supra*, § 684, at 143.

If in the exercise of reasonable diligence, the trustee discovers conditions adversely affecting the security of the investment, it is bound to take "all such lawful means with reasonable promptness to recover the debt and prevent loss to the estate, which a man of fair judgment, reasonable care and prudence, would take under such circumstances." *In re Stark's Estate*, 15 N.Y.S. at 732. The circumstances under which the trustee's actions are to be judged must be considered "under the rule that what one knows and what one in the exercise of ordinary care and prudence ought to know are regarded as equivalent in the law." *Matter of Dalsimer*, 251 A.D. 385, 388, 296 N.Y.S. 209 (1937), *aff'd mem.*, 277 N.Y. 717, 14 N.E.2d 818 (1938). If it becomes clear or should have become clear that the investment is no longer proper for a trust, it is the duty of the trustee to dispose of it within a reasonable time. Scott, *supra*, § 231; *see* Bogert, *supra*, § 685; Restatement (Second) of Trusts § 231 (1959). Thus, "if the prudent thing to do was sell, failure to sell was a breach of duty." *Matter of Mendleson*, 46 Misc.2d 960, 974, 261 N.Y.S.2d 525 (Sur.Ct. 1965). *See Matter of Ziegler*, 256 A.D. 305, 306, 10 N.Y.S.2d 344 (1939).[18]

Chase does not dispute these well settled principles. It argues rather that it acted prudently under the circumstances. The Court finds to the contrary.

### 1. *Inadequate Monitoring of the Investment.*

Chase's conduct in the monitoring of the loan between the late sixties and late

anyone else to assume trust responsibility for PSCC's ³⁄₄₇th interest.

**18.** Chase argues that *Ziegler* is inapposite because the beneficiary there had asked the trustee to sell the loan. However, unless the beneficiary completely assumes the fiduciary's functions, it is simply of no moment whether a beneficiary makes such a request; the trustee is

charged with knowledge that it is obligated to dispose of an improper investment. *See Matter of Frame*, 245 A.D. 675, 682, 284 N.Y.S. 153 (1935). In any event, PSCC did ask Chase to dispose of the illiquid investments after 1972, including the Glassmanor loan. Thus, *Ziegler* is not in fact distinguishable on this ground.

seventies was negligent. Its inspection and appraisal reports were inadequate in the circumstances. Chase did not have regional offices where local personnel might have ongoing inspection of properties and general conditions in the Washington, D.C. area; consequently, Chase inspectors, who saw the complex only once or twice over many years were reporting to people who never saw the property at all. Moreover, closer attention was required for an aging complex experiencing significant turnover, where proper maintenance was crucial. In these circumstances, the Court accepts the testimony of plaintiff's witnesses Murray and Cocker that Chase's one-half to one-and-one-half page reports containing little but such simple characterizations as "fair condition" were inadequate to report the condition of a project containing 771 apartments in thirty buildings spread over thirty acres. The superficiality of the reports suggests that adequate inspections were never performed, for proper inspections could not have failed to detect the highly visible deterioration established by the evidence.

In addition, the failure to conduct inspections for the five years between 1970 and 1975 was negligent in all the circumstances. By 1970 Chase officials had received some indication that the property suffered a possibly serious vandalism problem as well as a general lack of maintenance. Both vandalism and lack of maintenance are signs of poor management. In these circumstances, the failure to make more frequent or detailed inspections, indeed, the failure to make any significant inspection at all for five years fell far short of accepted practices in mortgage management and was a breach of Chase's fiduciary obligations.

2. *Negligent Failure to Learn of the Unsuitability of the Investment by 1973.*

Chase next argues that any absence of monitoring in the early 1970's could not have been the cause of PSCC's loss, be-

cause, first, the apartments did not experience significant deterioration until approximately 1977, by which time Chase was making adequate efforts to keep on top of the situation, and, second, the events leading to the deterioration were beyond its control. The preponderance of the evidence, however, is to the contrary.

To support its contentions about the timing of the deterioration, Chase relies on its inadequate inspection and reappraisal reports and the testimony of Elliot, who saw the property only once before 1978 and whose assessment the Court rejects. The only witness whose testimony is entitled to any credit, because of his knowledge and the credibility of his statements, was Murray. The Court finds on the basis of Murray's testimony, the housing code violations and several documents from Chase's files that the maintenance of the apartments began noticeably slipping about 1969 or 1970; by 1973, the conditions leading to the near total uninhabitability of the apartments by the end of the seventies were evident. Had Chase taken due measures to stay apprised of developments at Glassmanor, it would have become aware of the situation at least by late 1973.

Thus, "[l]ong before the loss became inevitable every signpost of danger to the security of the mortgage [should have been] seen by the trustee's agents charged with the duty of protecting the investment." *Matter of Baxter,* 164 Misc. 183, 185, 297 N.Y.S. 885 (Sur.Ct.1936), *aff'd mem.,* 250 A.D. 701, 294 N.Y.S. 488, *aff'd mem.,* 275 N.Y. 614, 11 N.E.2d 782 (1937). Chase was not required to possess prescience, but it should have been able to read the writing on the wall. The conditions evidenced by the housing code violations should have laid to rest any hope that the owner would be able to maintain payments and refinance the large balloon balance, or that any other interested investor with sufficient capital would come along either to buy the loan at par or to buy the apartments and save the security.[19] Thus,

---

**19.** Chase relies on the low loan to value ratios

based on its reappraisals in 1973 and 1976 to

Chase should have realized by late 1973 that the loan had become an improper trust investment.

In support of its contention that the deterioration was beyond its control, Chase argues that the decline was brought on by the combination of the change in tenancy, the Arab oil embargo, which dramatically increased heating costs, and the nationwide real estate recession in the mid-seventies. Of course, if Chase were unable to prevent the loss because the deterioration seen in 1977 were due to unexpected forces outside Chase's control, then it would not be liable for the loss. *Matter of Kramer,* 172 Misc. 598, 606, 15 N.Y.S.2d 700 (Sur.Ct.1939).

The Court finds on the basis of the un-contradicted evidence that the general housing recession had no adverse impact on Glassmanor. Murray testified that the recession slowed construction and residential housing sales in the Washington, D.C. area, and consequently had a favorable impact on rental income for apartments like Glassmanor. The Court also finds that the events that rendered the property an improper trust investment transpired before the Arab oil embargo had a substantial affect in heating expenses in 1974 and 1975.[20]

Likewise the Court rejects the defendant's argument that the deterioration evident in 1976 and 1977 was due to the fact that maintenance expenses fell substantially at this time. First, the 1975 expenses were above average, yet County inspectors found hundreds of code violations from ear-

ly 1975 through January 1976, violations which cannot have been the result of only one or two years' poor maintenance. Moreover, the remarkable similarity in the violation notices from 1971 to 1977 provides strong support for Murray's testimony that the deterioration was a steady process over the period in question, and not something that occurred suddenly in January 1976.

In sum, Chase should have known that through poor management by the owner, the loan had become an improper trust investment by the fall of 1973, well before the oil embargo or the drop in maintenance expenditures.

### 3. The Inadequate Efforts to Sell the Loan.

Chase argues, finally, that its efforts to sell the loan after 1971 satisfied any duty it may have had to make reasonable efforts to dispose of an investment no longer suitable for a trust. PSCC's criticisms of Chase's efforts, the argument goes, merely charge Chase with errors of judgment, for which a trustee cannot be held liable. *See Costello v. Costello,* 209 N.Y. 252, 261, 103 N.E. 148 (1913); *In re City Bank Farmers Trust Co.,* 189 Misc. 942, 68 N.Y.S.2d 43, 52 (Sup.Ct.1947); *Matter of Wildenburg,* 177 Misc. 49, 58, 29 N.Y.S.2d 896 (Sur.Ct. 1941); *see also In re Weinberg's Will,* 69 N.Y.S.2d 748, 752 (Sur.Ct.1945) (court refused to surcharge the trustee for decision not to sell "attributable to an honest error of business judgment and not to any negligence ...."). However, Chase failed to ex-

---

show that the loan was still adequately secured. However, the Court rejects as unrealistic the appraisers belief that the property would continue to generate sufficient income to warrant the high valuations. This expectation survived only because Chase failed to appreciate the steady, significant decline in the condition of the property.

**20.** Owen suggested that the owner could not pass on the increase in heating fuel costs because of the change in racial composition of the neighborhood and the increase in vandalism. Even if this is true, the pressure due to increased heating expenses came too late to explain the already extensive deterioration of the Glassmanor apartments. The Court also rejects

defendant's implicitly racist argument that it was powerless to stop an ineluctable tide of deterioration brought on by the integration of the neighborhood. Similar apartment complexes in the vicinity which were better maintained experienced the same changes in tenancy without suffering as serious a decline as that of Glassmanor. The Court finds that the increase in costs could not be passed on primarily because the apartments were in such poor condition as to substantially reduce demand and, thus, rental income. The downward pressure on income was thus the product of the poorly maintained condition of the property vis-a-vis the competition and would have existed even in the absence of substantial costs increases.

ercise reasonable judgment in its efforts to sell the loan.

The Glassmanor loan was never offered at a discount that reflected the deteriorated condition of the property. Owen, who had the responsibility for selling the loan, explained that he did not know "what such a discount would have been." This was precisely Chase's problem. It was unaware of the condition of the property and did not realize that it was necessary to accept a substantial discount in order to sell the loan. Chase thus failed to heed the well known admonition "take your losses and let your profits run," which applied with particular force to the situation which confronted Chase for the four years commencing in 1973 and ending with the default on the loan. Chase was not, of course, required to scour the country for potential but unidentified buyers of the asset, *see, e.g., In re Reinhard's Estate,* 322 Pa. 325, 185 A. 298, 299 (1936); it was, however, required to make such effort as prudent investors of fair judgment would have made to sell the loan. Offering the loan at a price divorced from reality did not satisfy that obligation.

Although as defendant argues, a trustee cannot be surcharged for failing to sell what nobody would buy, *see In re Reinhard's Estate,* 185 A. at 299; *Matter of Whitmore,* 172 Misc. 277, 281, 15 N.Y.S.2d 379 (Sur.Ct.1939), the evidence shows not that no one would buy the loan, but that the loan could only be sold at a discount. In 1971 the New York Bank for Savings bought the loan and then returned it under a provision requiring Chase to repurchase any loan because of problems with the security. In early 1976, Chase declined an offer to buy the loan at a 20% discount. Later that year, New York Bank again agreed to buy the loan, and again declined, after visiting the property.[21] In 1977, Chase turned down the owner's second offer to buy the loan at a 20% discount. Later in 1977, an agreement to buy the loan at a price near par fell through when the owner was unable to secure financing for such a sale.

As Professor Scott observed, where there is no sale, it is impossible to fix exactly the moment by which the loan should have been sold or the amount that could have been obtained; "[p]robably the only rule is that the court will use its common sense and determine what under all the circumstances it is fair to say that the trustee ought to have received if he had done his duty in selling the property within a reasonable time." Scott, *supra,* § 209, at 1693. The Court finds that the loan should have been sold by mid-1975, thus allowing a generous amount of time to dispose of the loan after it became an improper investment in late 1973.[22] *See In the Matter of*

---

**21.** Defendant argues that *Ziegler,* 256 A.D. 305, 10 N.Y.S.2d 344, and *Reinhard,* 185 A. 298, stand for the proposition that one unsuccessful attempt to sell is sufficient to negate liability for failure to sell an improper trust investment. The Court finds this interpretation implausible. In *Reinhard,* the Court held that in the circumstances the trustee had "done all that was possible." *Reinhard,* 185 A. at 299. The trustee had a standing request with its broker to sell the stock and had attempted to sell the stock to the issuer. No offer for the stock was ever received. Regardless of the exact rule *Reinhard* embodies, a broker's failure to sell a relatively freely traded commodity like stock may be more probative of the condition of the market, especially when the stock was arguably worthless, than is Chase's failure to sell a mortgage at a price in excess of its intrinsic value. As to *Ziegler,* defendant misconstrues the facts of that case. The Appellate Division noted that the trustee was aware in 1930 that the mortgage should have been sold, but made no effort to do so except by offering it to a tenant. The court found this conduct negligent and held that the trustee would be surcharged unless it was shown that there was no market for the property between 1930 and 1934, "when the trustee first offered it for sale." 256 A.D. at 306, 10 N.Y.S.2d 344. Nothing in the Appellate Division's opinions at 256 A.D. 305, 10 N.Y.S.2d 344, and 258 A.D. 1077, 18 N.Y.S.2d 24 suggests that the unsuccessful offer to sell the property to the tenant occurred in 1934 and was the basis for the court's finding that the trustee's responsibility ended as of 1934. In any event, there is nothing in *Ziegler* indicating that the tenant was interested in buying at a reasonable price which the trustee rejected.

**22.** The Court's ruling here is consistent with the factors listed in § 231 of the Restatement [Second] of Trusts (1959) for determining when the duty to sell arises. First, it appears that the

*Frame,* 245 A.D. 675, 685, 284 N.Y.S. 153 (1935) (eighteen months is generally the maximum time a trustee should hold an investment after it becomes improper). Chase does not dispute the application of the ordinary eighteen month requirement; it has presented no evidence that this was an insufficient amount of time to sell a mortgage loan. Indeed, David Carroll, a member of the Trust Committee, testified that in 1971 he had expected Chase to sell all the mortgage loans within six months to a year. Based on Chase's mid-1975 valuation of the loan at 94¢ on the dollar (based solely on the then present value of future payments), the condition of the property and the early 1976 offer to purchase at a 20% discount which Chase rejected, the Court finds that by mid-1975 the loan could have been sold at 80¢ on the dollar. PSCC's share of the proceeds would have been $165,923.26.[23]

## III. CHASE'S DEFENSE

### A. *Contractual Release*

■■■ Chase sought to prove at trial that by written agreement PSCC had "releas[ed] and forever discharg[ed] [Chase] ... from any and all ... claims" concerning, among other things, the Glassmanor loan. Chase failed, however, to show by any credible evidence that the release was ever executed.

In August, 1975, Chase sent two copies of a release to PSCC addressed to Richard Korpan, Assistant Treasurer. One of the copies was located in PSCC's files unsigned. Elizabeth Fiore, a Chase Vice-President, testified that she found the second copy on her desk one morning over two years later, signed not by Korpan, but by James Bumpus, PSCC's Vice-President and chief financial officer. She did not know how or why the document appeared on her desk. After that the purportedly signed copy disappeared as mysteriously as it appeared; neither it nor a copy could be found at the time of trial.

Bumpus, the alleged signatory, testified that he had not even seen the document. When he was asked whether he had signed it, counsel for Chase objected to the question, apparently on grounds of redundancy; counsel explained that the witness had already testified "that he never saw the document and it is not addressed to him." In any event, there is no credible evidence that Bumpus signed the release.

### B. *Estoppel*

■■■ The Trust Agreement provided that in the absence of objection, PSCC would be "deemed to have approved such account ... [and Chase would be] released, relieved and discharged with respect to all matters and things set forth in such account as though such account had been settled by the decree of a court of competent jurisdiction." Chase argues that because PSCC failed to object to the investment in the Glassmanor mortgage until 1977, Chase has been released from liability for retaining the loan. *See In re Button's Estate,* 63 N.Y.S.2d 782, 784 (Sur.Ct. 1946); *In re Baron,* 6 N.Y.S.2d 631, 636 (Sup.Ct.1938); *Matter of Packard,* 146 Misc. 65, 67–68, 261 N.Y.S. 580 (Sur.Ct. 1932). Chase points out that an accounting need not set forth in minute detail a complete narrative of every investment, *Matter of Van Deusen,* 24 Misc.2d 611, 616, 196 N.Y.S.2d 737 (Sur.Ct.1960), and that a beneficiary is expected to make reasonable inquiry, when, for instance, accountings

---

market for mortgages was active in 1973 and there was no indication of a decline in the market thereafter. Second, there were opportunities for suitable reinvestment, as established by Chase's own decision to sell all mortgages on the grounds of their illiquidity and low yield compared to other potential trust investments. Third, the risk of retaining the property was unduly high given the deteriorated condition of the property. Fourth, the amount that could have been received on resale was not substan-

tially different than the property's intrinsic worth. Although the trustee's judgment as to such matters is ordinarily entitled to some deference, here Chase was wholly unable to exercise judgment, because it did not realize until much later that the property had become an improper investment.

**23.** This figure is 80% of the June 1975 cost value of PSCC's ³/₄₇th's share ($207,404.07).

show that foreclosure has occurred. *Id.* Nevertheless, the matters embraced by a release provision include only those things "which are clearly and specifically set forth and can be ascertained from a reading of the account ..." *Matter of Grace,* 62 Misc.2d 51, 55, 308 N.Y.S.2d 33 (Sur.Ct. 1970). *See also Matter of Van Deusen,* 24 Misc.2d at 614, 196 N.Y.S.2d 737; *Matter of Edwards,* 196 Misc. 997, 1005, 92 N.Y. S.2d 780 (Sur.Ct.1949). Chase's periodic accountings set forth only the address of the Glassmanor apartments, the maturity date of the loan, the outstanding principal and interest payments received. The accountings contained no information concerning the physical or financial condition of the property. Neither the accountings nor any other communication from Chase hinted at the seriously deteriorating condition of the Glassmanor apartments prior to the late 1970's. And until 1977, payments under the loan were current. PSCC cannot be faulted for not inquiring into matters never called to its attention. It will not be charged with ratifying retention of the loan when it had no knowledge, let alone "full knowledge of all the material particulars and circumstances." *Adair v. Brimmer,* 74 N.Y. 539, 553–54 (1878).

■ Chase also argues that under the amended trust agreement, PSCC's failure to give a written direction to sell the investment released Chase from liability for ordinary negligence in retaining the loan. The 1973 amendments gave PSCC the power to direct Chase, in writing, to dispose of investments. The amendments further provided that Chase "shall be under no liability for any loss of any kind which may result ... by reason of its failure to exercise [the power to sell] ... because of the failure of [PSCC] to give such direction."

During the late 1972 discussions leading to these amendments, PSCC asked to be released from illiquid investments, including the Glassmanor loan. Chase officials essentially informed PSCC that this request was unnecessary; they were attempting to sell the loan, but until they did so, PSCC could not be released from its participation. Thus, although the bulk of PSCC's trust fund under the amended agreement was placed in directed accounts managed by non-Chase advisors, the illiquid investments, including the Glassmanor loan, were placed in a separate account, over which Chase retained management responsibility for monitoring, review and disposition.

Nothing in the 1973 agreement or the conduct of the parties under the agreement suggests either that PSCC had a duty to renew the request to sell the loan or that PSCC was expected to monitor the security for the loan and to inform Chase when the loan was no longer a proper trust investment. In the circumstances, PSCC was not required to supplement its 1972 request with a superfluous letter to the same effect.

## C. *Timeliness*

■ The Court rejects Chase's related and totally meritless contention that this action is time-barred. Chase argues that PSCC knew or should have known of the facts on which it bases its claim by 1972, and that the six year limitation period had expired by the time PSCC brought this action in 1978. However, PSCC was not required, in the exercise of reasonable diligence, to visit the security for any mortgage in which Chase held participations on its behalf. Chase's accountings told PSCC nothing, and little more would have been learned had PSCC inquired of Chase as to the condition of the property. Indeed, Chase informed United Bank of Denver as successor trustee in 1975 that the property was in fair condition. Thus, charging PSCC with the knowledge that reasonable inquiry would have revealed, the Court finds that PSCC had no reason to suspect the difficulties at Glassmanor until the late seventies. Thus, the bringing of this action in 1978 was timely under C.P.L.R. § 213 (McKinney 1972) and in no sense constituted laches.

## IV. PREJUDGMENT INTEREST

PSCC claims that in addition to the amount of lost principal, it is entitled to the

profit that would have accrued had it been able to make more suitable investments with the proceeds that should have been obtained from a sale of the loan in 1975. Defendant concedes that PSCC is entitled to interest on any judgment in its favor, but denies that PSCC may claim lost profits. Whatever the legal merit of PSCC's claim, the proof is inadequate to establish the profit plaintiff would have made on investments from 1975 to the present. Plaintiff introduced evidence as to its earnings on equity securities after mid-1975. However, it introduced no evidence concerning its earnings on the third of its funds in fixed income investments, and its own witness conceded that fixed income investments were adversely affected by rising interest rates in the latter half of the seventies.

 There being insufficient proof to support an award above the legal rate and no reason to adopt a lower rate, interest will be at the legal rate, 6% on $165,923.26 from June 1975, until June 25, 1981, and 9% thereafter. C.P.L.R. §§ 5001, 5004 (McKinney 1963 & Supp.1982). Due allowance will be made for payments of interest and principal after June 1975. The parties will submit appropriate calculations.

## V. ATTORNEY'S FEES

 PSCC has moved for attorney's fees, not against the trust, but against the trustee personally. Defendant argues that fees may be assessed against the trustee itself only if it has acted in bad faith or engaged in self-dealing. However, the Court finds no such limitation upon its discretion under the New York cases. Although courts have often exercised their discretion to assess fees against trustees who have engaged in self-dealing, *see, e.g.*, *Matter of Bausch*, 280 A.D. 482, 494, 115 N.Y.S.2d 278 (1952); *Matter of Rothko*, 84 Misc.2d 830, 885, 379 N.Y.S.2d 923 (Sur.Ct. 1975), *modified on other grounds*, 56

A.D.2d 499, 392 N.Y.S.2d 870, *aff'd*, 43 N.Y.2d 305, 401 N.Y.S.2d 449, 372 N.E.2d 291 (1977); *Parker v. Rogerson*, 76 Misc.2d 705, 710, 350 N.Y.S.2d 950 (Sup.Ct.1973), *aff'd*, 49 A.D.2d 690, 373 N.Y.S.2d 1022 (1974), the Court is aware of no case holding that fees may be granted only in such circumstances. Indeed, the New York Court of Appeals has assessed fees against a trustee for failure to sell stock within a reasonable time. *In re Garvin*, 256 N.Y. 518, 522, 177 N.E. 24 (1931). Other cases are in accord, assessing negligent trustees with costs, *Matter of Ziegler's Estate*, 258 A.D. 1077, 18 N.Y.S.2d 24 (1940); *Matter of Caffrey*, 254 A.D. 684, 3 N.Y.S.2d 443 (1938), and attorney's fees. *In re Rosenbaum*, 115 N.Y.S.2d 450, 453 (Sur.Ct.1948) (improvident settlement of claim on behalf of trust estate), *aff'd in relevant part*, 277 A.D. 199, 206, 97 N.Y.S.2d 871 (1950), *modified on other grounds*, 303 N.Y. 715, 103 N.E.2d 338 (1951).

Here, the defendant's neglect of the duties it held itself out as professionally competent to perform has caused the loss to the trust. That same negligence—the failure to stay apprised of the condition of the Glassmanor loan—has put plaintiff to the trouble of establishing long after the fact the state of the apartments in the late 1960's and 1970's. Thus plaintiff has been put to considerable expense in the satisfaction of its duty to protect the assets of its pension fund. Under all the circumstances, the Court believes that justice will be served by assessing costs and fees against the defendant trustee rather than the trust.

 Accordingly, the Court denies defendant's motion for attorney's fees. Fees are rarely awarded to a trustee who is unsuccessful in defending charges that it negligently managed the trust. Chase's legal fees here were incurred neither for the preservation of the trust nor any cause beneficial to the trust.[24]

---

**24.** Likewise, the expenses incurred in defending this suit were not "expenses of administration" within the meaning of Article Seven of the Trust Agreement. Thus, Article Seven's provision that the trustee will be compensated for "expenses of administration" did not include costs for unsuccessfully defending a suit for negligent management of the trust.

The parties will make appropriate submissions with respect to prejudgment interest and set-offs for payments of principal and interest and with respect to a reasonable attorney's fee, plaintiff to submit within 20 days from the date of this opinion and defendant to respond within 20 days thereafter.

This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.Proc. 52.

Judgment for the plaintiff.

## SUPPLEMENTAL OPINION

Pursuant to the court's direction in its opinion filed July 20, 1983, counsel for the plaintiff has filed submissions regarding costs and attorneys' fees, and counsel for the defendant has submitted a calculation of damages and has responded to the requests for allowance of attorneys' fees and costs.

The court has examined the defendant's calculation of damages in accordance with the court's opinion. The court found that PSCC would have received $165,923.26 had the loan been sold by Chase in June 1975 at a discount of 20% (the 1975 Sum). The computation accrues interest on this amount, and credits each payment on the loan, first to accrued interest, and then against the outstanding balance of the 1975 Sum. Subsequent prejudgment interest is then calculated on the remaining balance. The schedules and exhibits submitted by defendant show quarterly payments to PSCC from June 1975 to November 1977, monthly payments from March 1979 to August 1981 and a final payment, after sale of the loan, of $69,297.54. After allowances for interest, this leaves a balance of $85,-422.75 due PSCC, as of October 17, 1983, with prejudgment interest of $20.3264 per diem. The court approves of these calculations, to which PSCC has taken no exception.

Counsel for PSCC have asked for an allowance of $193,607.50 attorneys' fees and costs of $37,102.89. The court has examined the detailed diary entries and computations in support of the requests, and Chase's objections thereto. The court finds that a reasonable expenditure of time in preparation and trial, in view of the closely contested discovery proceedings and the production of evidence, justifies the allowance of $180,000 for attorneys' fees. Moreover, it is relevant to consider that plaintiff's counsel has achieved a result which will similarly benefit the other pension funds involved in the Glassmanor investment, two of which funds have already retained plaintiff's counsel in connection with their investment. In view of the travel requirements and necessity of expert witnesses and discovery regarding the Glassmanor property located in Prince Georges County, Maryland, and the numerous depositions taken, the costs are allowed in the amount requested.

The parties are requested to submit proposed judgments on or before December 15, 1983.